The First Division of The St. Paul and Pacific Rail Road Company

*vs.*

Frank M. Parcher, County Treasurer, and Henry Kreis, County Auditor of the County of Wright.

Under the Five Million Loan Amendment to the Constitution of this State, the mortgage required upon " the roads, lands and franchises" of the companies accepting the loan, was a mortgage upon all the roads, all the lands, and all the franchises of such companies, including the corporate franchise or right to be a corporation. The power to mortgage such corporate franchise was given to the Minnesota and Pacific Railroad Company, by the 21st Section of its Charter, as well as by the amendment aforesaid. By virtue of a foreclosure (as alleged in the complaint in this case) of the mortgage or deed of trust executed by the Minnesota and Pacific Railroad Company in accordance with said amendment to the Constitution and provisions of law, the State of Minnesota as purchaser at the foreclosure sale, became owner of all the roads, lands and franchises of the Minnesota and Pacific Railroad Company.

It was competent for the State to take and hold the same without merger or extinguishment like a private person. If anything was wanting to make perfect the title of the State to all the roads, lands and franchises of the Minnesota and Pacific Railroad Company, it seems that such title would be made perfect by the forfeiture accruing under the Act of March 8th, 1861, entitled " An Act to facilitate the construction of the Minnesota and Pacific Railroad." Upon such foreclosure and forfeiture, the Act of March 10th, 1862, entitled " An Act to facilitate the construction of the Minnesota and Pacific Railroad, and to amend and continue the Act of Incorporation relating thereto," operated to transfer to the persons named therein, all the roads, lands and franchises of the Minnesota and Pacific Railroad Company. This act does not violate *Section 2 of Article 10, of our State Constitution.*

The St. Paul and Pacific Railroad Company, upon being organized under and in pursuance of said Act of March 10th, 1862, became a corporation, and was vested with all the roads, lands and franchises of the Minnesota and Pacific Railroad Company, including the corporate franchise of the same. Under an arrrangement made between the St. Paul and Pacific Railroad Company, and the holders of special and preferred stock, (the details of which arrangement are particularly set forth in the complaint and opinion) the Act of March 4th, 1864, relating to the registry of railroad organizations, and the Act of February 6th, 1866, entitled " An Act to legalize and confirm the organization, acts and proceedings of the First Division of the St. Paul and Pacific Railroad Company, and in relation to the character and powers of said company," the First Division of the St. Paul and Pacific Railroad Company became a body corporate, and as such was authorized to sue and be sued, and was endowed with all the rights, benefits, privileges, property, franchises, powers, and interests purporting to be granted and conferred under the arrangement before referred to, and said Act of February 6th, 1866.

It was competent for the legislature of the territory of Minnesota to grant to the Minnesota and Pacific Railroad Company the right to hold the lands granted by the United States in aid of its lines of road, exempt from taxation, until the same were sold and conveyed by said company, and this grant was made by the 18th section of the charter of said company. The Territory had power to bind the future State by such grant of exemption. This grant was not in contravention of the provision of section 6 of our Organic Act, which reads as follows : " Nor shall the land or other property of non-residents be taxed higher than the lands or other property of residents." The agreement of the Minnesota and Pacific Railroad Company to build the lines of railroad, and to fulfil the other duties imposed by the charter, and among them to pay taxes as therein prescribed, was a sufficient consideration to sustain such grant. This grant of exemption was not personal to the Minnesota & Pacific Railroad Company, but passed to the State, if not as a franchise, as a right appendant to the lands, and was held by the State without merger or extinguishment.

Upon the transfer by the State to the St. Paul & Pacific Railroad Company, this right passed with the lands, and other rights and franchises to said company. Under the arrangement and legislation of Feb. 6th, 1866, before referred to, this right passed to The First Division of the St. Paul & Pacific Railroad Company, so far as it related to the lands applicable to those portions of the road and branch acquired by said First

The First Division of the St. Paul and Pacific R. R. Co. v. Parcher et al.

Division. The transaction between The St. Paul &. Pacific Railroad Company and the holders of its special and preferred stock, through which, and the act of Feb. 6th, 1866, The First Division of the St. Paul & Pacific Railroad Company became a corporation, and possessed of such lands, was not a sale and conveyance of the lands within the meaning of the 18th section of the charter of the Minnesota & Pacific Railroad Company, so as to subject the same to taxation.

This action was brought in the District Court for Wright county, to enjoin the sale of certain lands of the plaintiff in said county, for the taxes levied thereon by the authorities of that county for the year 1867, and to procure the judgment of the court, decreeing and declaring such taxes illegal and void; the plaintiff claiming that by virtue of the charter of the Minnesota and Pacific Railroad Company, passed by the legislative assembly of the Territory of Min nesota, May 22d, 1857, and subsequent acts amendatory thereof,—under and pursuant to the provisions of which its title to said lands has been acquired—such lands are wholly exempt from taxation until sold and conveyed, or contracted to be sold, conveyed or leased, by the plaintiff.

A demurrer was interposed to the complaint. The points made by the demurrer are:

*First.* That the plaintiff hath no capacity to sue; for that it is not a body corporate, nor a natural nor an artificial person.

*Second.* That there is a defect of parties plaintiff; in that the complaint shows that one E. B. Litchfield and sundry other persons not named in the complaint, are the real parties in interest, and therefore should be named as plaintiffs in the action:—and

*Third.* That the complaint does not state facts sufficient to constitute a cause of action.

The demurrer was overruled in the court below, and the defendants appeal to this court.

The case is fully presented in the opinion of the court.

GORDON & COLLINS for Appellants.

H. R. BIGELOW for Respondent.

*By the Court.*—BERRY, J.—This appeal is taken from an order overruling a demurrer to the complaint. The complaint alleges that the plaintiff is a body corporate, created and existing under and by virtue of certain laws and proceedings therein mentioned and referred to. The first ground of demurrer is, that it appears upon the face of the complaint that the plaintiff is not a body corporate, and has no legal capacity to sue as such. For the purpose of determining the issue thus made, it is necessary for us to examine the laws and proceedings referred to and set up in the complaint. By an Act of the Legislative Assembly of the Territory of Minnesota, approved May 22, 1857, The Minnesota and Pacific Railroad Company was incorporated and endowed with " all the powers, privileges, franchises and immunities, incident to a corporation." On the 27th day May, 1857, said company was duly organized under the Act aforesaid, and on the same day duly signified its acceptance of the terms and provisions of its charter. By a constitutional amendment adopted April 15, 1858, four companies, commonly known as the Land Grant Railroad Companies, were authorized to receive from the State in aid of the construction of their lines of railway, certain bonds designated as " Minnesota State Railroad Bonds." This amendment provided, among other things, that as further security for the payment of the principal and interest of the State bonds

thus authorized to be issued, " an amount of first mortgage " bonds on the roads, lands and franchises of the respective " companies, corresponding to the State bonds issued, shall " be transferred to the Treasurer of the State at the time of. " the issue of State bonds, and in case either of said com- " panies shall make default in payment of either the interest " or principal of the bonds issued to said companies, " the Governor " may require a foreclosure of the mortgage ex- " ecuted to secure the same. " The Minnesota & Pacific Railroad Company was one of the four Land Grant Companies, and as alleged in the complaint it received Minnesota State Railroad Bonds to the amount of $300,000 and more, under and pursuant to the provisions of the amendment to the Constitution, which said bonds were so issued and delivered to said company upon securities given as prescribed and required in said amendment, and by an Act of the Legislature entitled " An Act concerning Land Grant Railroads, " approved August 12, 1858. By *Section 5 of the Act of August* 12, 1858, above referred to, it is provided that foreclosures of the mortgages or deeds of trust required by the amendment to the Constitution, should be "by pub- " lic sale of all the property, rights, privileges, and fran- " chises pledged in such deed of trust or mortgage; * * * " and in case of any sale of any railroad or railroads, or any " part thereof, constructed or in process of construction, by " any railroad company by virtue of any trust deed, or on " foreclosure of any mortgage thereupon, the party or par- " ties acquiring title under any such sale, and their associ- " ates, successors, or assigns, shall have and acquire thereby, " and shall exercise and enjoy thereafter, all and the same " rights, privileges, grants, franchises, immunities and ad- " vantages in and by said mortgage or trust deed enumer- " ated and conveyed which belonged to and were enjoyed

vol. xiv.—20

" by the company making such deed or mortgage, or con-
" tracting such debts, so far as the same relate and apper-
" tain to that portion of the said road, or the line thereof,
" mentioned and described in and conveyed by said mort-
" gage or trust deed, and no further, as fully and absolutely
" in all respects as the corporation, shareholders, officers
" and agents of said company, might or could have done
" theretofore, had not such sale or foreclosure taken place.
" Such purchaser or purchasers, their associates, successors
" or assigns, may proceed to organize anew and elect direc-
" tors, distribute and dispose of stock, take the same or
" another name, and may conduct their business generally
" under and in the manner provided in the charter of such
" railroad company, with such changes or variations in man-
" ner and form of organization as their altered circumstances
" and better convenience may seem to require ; *Provided,*
" *however*, that no greater or enlarged powers shall be ex-
" ercised by the new organization than are conferred by the
" charter of such company. " The Act of March 6th, 1860,
being an Act in addition to the "Act concerning Land
Grant Railroads, " after reciting the default of the compa-
nies in providing for the payment of interest, made it the
duty of the Governor to foreclose the mortgages or deeds of
trust, and authorized him to bid off and purchase the prop-
erty, rights and franchises covered and embraced in such
mortgages or deeds of trust, in the name of the State, and to
make or cause to be made to the State proper conveyances
therefor.

The complaint further alleges, that said Minnesota & Pa-
cific Railroad Company having made default in providing
for the punctual payment of the interest upon the bonds
issued to it by the State, the Governor proceeded to fore-
close the mortgage or deed of trust given to secure the

State, and did in fact foreclose the same, in conformity with law and with the provisions of such deed of trust, by sale of the property, rights, and franchises covered and embraced in said deed, and under such sale, made on or about June 23d, 1860, did bid off and purchase the same for and in the name of the State.

What did the State acquire by virtue of the foreclosure ? The security required by the amendment to the Constitution, and which is alleged in the complaint to have been given by the Minnesota & Pacific Railroad Company, was a certain amount of the company's bonds secured by a first mortgage upon its "roads, lands and franchises." This language will bear but one construction, and that is, that the mortgage required and given was a first mortgage upon *all* the roads, *all* the lands, and *all* the franchises of the company. This included the corporate franchise, or the right to be a corporation. The power to mortgage this corporate franchise was conferred upon the company by the 21st section of its charter, or if there be any doubt as to this, it is clear that it was conferred by the amendment to the Constitution, which required, and of course authorized, all the Land Grant Companies accepting the State Bonds to secure the State by a first mortgage upon *all* their franchises, as we have before seen. The State of Minnesota became then, by virtue of the foreclosure, the owner of all the roads, lands and franchises of the Minnesota and Pacific Railroad Company. It was competent for the State to take and hold whatever it acquired by the foreclosure, without merger or extinguishment, to lay down its sovereign character for the occasion, and take and hold like a private individual. This power was plainly conferred upon the State, as upon any other purchaser, by the acts of August 12th, 1858, and of March 6th, 1860, before referred to ; and, in-

dependent of these statutes, the same principles, and the same reasons which prevent the merger of an equitable, in a legal estate, when the two are in the same person, and where the intention and interest of such person require them to be kept separate, would permit the State, in this instance, to acquire and to hold the fruits of the foreclosure unmerged and unextinguished. See *Davis vs. Pierce*, 10 *Minn.*, 378 ; *Horton vs. Maffitt*, *ante*, page 289 ; *Bank of United States vs. Planters Bank of Georgia*, 9 *Wheaton*, 904 ; *Angell & Ames on Corp.*, § 32.

It was for the *interest* of the State to hold what was acquired through the foreclosure, without merger, because this would better enable it to secure the successful prosecution of important enterprises which it could not well carry on itself. If the State was in a position to offer to parties willing to undertake the construction of the roads, *all* the franchises of the original companies, it was able to offer greater inducements than if any of these franchises had become extinguished upon the foreclosure. As a recipient of the Congressional Land Grant, the State had assumed a trust which good faith and public interest required to be discharged in the way most likely to accomplish its purposes. That it was necessary to hold out great advantages in order to induce parties to enter upon and prosecute the construction of the roads, is matter of history. The long delays and repeated discouragements which the people of this State experienced in their attempts to secure convenient communication with the markets of the country are familiar to all.

That it was the *intention* of the State to hold what she acquired, without merger, will we think sufficiently appear from legislation subsequent to the foreclosure, to which we shall have occasion to advert more particularly hereafter,

by which she assumed to transfer and assign all the franchises of the Minnesota and Pacific Railroad Company, including the right to be a corporation.

But the title of the State to all the roads, lands and franchises of this company does not rest upon the foreclosure alone. By an act of the legislature approved March 8th, 1861, and entitled " An Act to facilitate the construction of the Minnesota & Pacific Railroad," it is enacted : " *Section* " 1. That the road, lands, property, rights, franchises, privi- " leges, and immunities belonging or appertaining to the " Minnesota & Pacific Railroad Company prior to the sale " and purchase thereof by the Governor on the 23d day of " June, 1860, on behalf of the State, and now claimed or " held by the State, and all bonds and securities of the said " company held by the State, shall be and are hereby re- " leased, discharged and restored to the said company, free " of all liens and claims thereon held by or on behalf of " the State." By *section* 2, it is enacted, that the provisions in the act contained " *are upon condition* " that the company shall commence the construction of a certain portion of its road by a time named, and shall continue such construction, and complete, equip and put into operation its road and branch at rates and times specified.

*Section* 3 provides that " the said company shall, as a " further consideration of this act, construct and put into " operation and fully equip for business that portion of the " main line extending from St. Paul to St. Anthony on or " before the first day of January next, in default of which, " all the rights and benefits conferred upon said company " by virtue of this act, shall be forfeited to the State ab- " solutely and without any further act or ceremony what- " ever ; and in case the said company shall fail to con- " struct the other and further portions of said road and

" branch as aforesaid at the time or times aforesaid, the " said company shall forfeit to the State absolutely and " without any further act or ceremony whatever, all the " lands, property and franchises pertaining to the unbuilt " portions of said road and branch, and in either case, or " in any forfeiture whatever under the provisions of this " act, the State shall hold and be possessed of all such " lands, property and franchises so forfeited without merger " or extinguishment, to be used, granted or disposed of " for the purpose of aiding and facilitating the construc- " tion of said road and branch." By *section* 4, " As a " condition precedent to the right of said company to the " rights, privileges, franchises, road-beds, right of way, " properties and immunities hereinbefore granted and as- " signed or restored, and before any right or title what- " ever thereto shall vest in said company," said company is required to pay the costs and expenses of foreclosure, and deposit ten thousand dollars with the Governor " as a guaranty of their good faith." The complaint alleges that the company accepted this act, and made the payment and deposit required, but that the company wholly failed (among other failures) to construct, put into operation or equip for business that portion of said main line extend- ing from St. Paul to St. Anthony on or before the first day of January, 1862, and that at the time of the passage by the said legislature of an act approved March 10th, 1862, entitled " An Act to facilitate the construction of the Minnesota & Pacific Railroad, and to amend and continue the act of incorporation relating thereto," said company had not constructed, put into operation nor equipped for busi- ness any part or portion whatever of the main or branch line or lines of said railroad, and that no part of said rail- road has ever been completed and put into operation,

equipped for business, except by the St. Paul & Pacific Railroad Company hereinafter mentioned.

It will be observed that this release or restoration to the Minnesota & Pacific R. R. Co., was *conditional.* The company accepted it with the conditions attached, and upon failure to comply with such conditions, and as in itself a further condition, the *company forfeited to the State absolutely, and without any further act or ceremony*, all the rights and benefits conferred.

And by express provision, and as a consequence agreed to by the acceptance of the act, the State upon such forfeiture (a forfeiture to be accomplished and perfected by the mere failure of the company to perform, without any necessity for resorting to judicial proceedings to have such forfeiture adjudged or declared) was to hold and be possessed of all the lands, property and franchises so forfeited *without merger or extinguishment*, to be used, granted or disposed of for the purpose of aiding or facilitating the construction of said road and branches. If then anything was wanting in the foreclosure to make perfect the title of the State to all the roads, lands and franchises of the Minnesota & Pacific Railroad Company, it would seem that such want was amply supplied by the forfeiture under the Act of March 8th, 1861.

The effect then of these laws and proceedings was to vest all the roads, lands and franchises of the Minnesota & Pacific Railroad Company, in the State of Minnesota, including the franchise of corporate existence. In this condition of things the legislature on the 10th day of March, 1862, passed an Act by the first two sections of which it is enacted : " That " all the rights, benefits, privileges, property, franchises and " interests of the Minnesota & Pacific Railroad Company, " acquired by the State of Minnesota, by virtue of any acts,

" deeds, agreement or thing by the said company heretofore " done or suffered, or by virtue of any law of the State, or " the Constitution thereof, or of the former Territory of " Minnesota, or by reason of any sale of the same or any " part thereof by the Governor of this State, on the 23d day " of June, 1860, and bid in and purchased for the benefit of " the State, be, and the same are hereby granted and trans- " ferred to Dwight Woodbury, Henry T. Welles,   *   * "   *   *   *   their associates and successors, for the " purpose and on the terms and conditions hereinafter in " this act provided, free and clear of all claims or liens there- " on, and free from all liens and claims by or to the State " of Minnesota, except as hereinafter provided.

" *Section* 2.   All the rights, privileges, franchises, lands, " property and interests granted by the Territory of Minne- " sota to the Minnesota & Pacific Railroad Company, by " the Act of said Territory, approved May 22d, 1857, en- " titled ' An Act to execute the trust,'   *   *   * " are hereby continued and granted to, and vested in the " said Dwight Woodbury, Henry T. Welles,   *   *   * "   *   *   *   and their associates and successors, " with all the immunities, rights, property, benefits and " privileges which the said the Minnesota & Pacific Rail- " road Company had or might or could have by reason of " the passage of said Act, free and clear of all claim and liens " thereon, and free from all liens and claims of the State of " Minnesota against the same, except such as are retained " by the provisions of this Act, and the said persons herein- " before named, and their associates and successors, shall " hereafter be known as The St. Paul & Pacific Railroad " Company, and by that name may sue and be sued, and " have and exercise all the powers, rights, and privileges " which heretofore pertained to the said the Minnesota &

The First Division of the St. Paul and Pacific R. R. Co. vs. Parcher et al.

" Pacific Railroad Company, by the act hereinbefore referred
" to, or by any other act or law; and that the persons herein-
" before named shall be the directors of the said The St.
" Paul & Pacific Railroad Company for one year, and until
" others are elected or appointed in their places. " The lan-
guage of these sections requires neither comment nor expla-
nation to show what was intended and attempted by the
legislature: It is plain that these sections operated to trans-
fer to the persons named, all the roads, lands and franchises
of the Minnesota & Pacific R. R. Co., (which, as we have
endeavored to show, the State had acquired) and so far there
can be no objection taken to the action of the legislature.
But it is urged that the act transcends the power of the leg-
islature, because it attempts to form a corporation by special
act, in violation of *Sec. 2, Art. 10, of our Constitution.*

Whatever may be the meaning of the constitutional inhi-
bition referred to, we are of opinion that it does not forbid
such legislation as was had in this instance.   There was no
attempt here to create new corporate franchises, and thus to
form, and to bring into existence for the first time, that
which is the very essence of a corporation, and without
which a corporation is nothing; but corporate franchises
already in existence and held by the State as property,
without merger, in its general sovereignty, and without ex-
tinguishment, were *transferred* to the persons enumerated in
the act.   This, we think, was a legitimate and constitutional
transaction.

The complaint alleges that the St. Paul & Pacific Rail-
road Company was duly organized under and in pursuance
of the act of March 10th, 1862, and it follows that it be-
came and was a corporation, and succeeded to and was
vested with all the roads, lands and franchises of the Min-
nesota & Pacific Railroad Company.

The St. Paul & Pacific Railroad Company being then a duly organized corporation, and possessed of the roads, lands and franchises before-mentioned, the complaint proceeds to allege that said company "assumed the trusts and obligations " aforesaid, and took possession, and commenced the con- " struction of said railroad, and in the month of May, 1862, " did enter into a contract with certain persons, co-partners, " doing business under the firm name of Litchfield & Co., " for the construction and equipment, by said firm, of that " part of said railroad extending from the city of St. Paul " to Watab, in the county of Benton, a distance of about " eighty miles from St. Paul, excepting a portion of said " road then being built for said company by Winters & " Drake, between the city of St. Paul and the city of St. " Anthony, in and by which contract, it was provided, " among other things, that the said St. Paul & Pacific " Railroad Company, in part payment to said firm of Litch- " field & Co., for the construction and equipment of such " portion of said railroad as aforesaid, should issue to said " Litchfield & Co., $350,000 of the full paid capital stock " of such company, and that no other issue of such capital " stock should be made, except a sum not to exceed $60,000 " as specified in said contract, and that payment for such " construction and equipment—which included a very " large amount in addition to the stock so to be " issued therefor as aforesaid—should be made to " said firm from time to time, as the work should " progress, and in full as often as five miles of such road " should be completed, and a proportionate amount of ma- " chinery should be furnished. That said Litchfield and Co. " entered upon the performance of the said contract, and fully " performed the same on their part until the said railroad " had been fully completed and equipped, with the cars run-

The First Division of the St. Paul and Pacific R. R. Co. vs. Parcher et al.

" ning thereon, from St. Paul to Anoka, a distance of
" thirty miles, when the said St. Paul and Pacific Railroad
" Company became unable to perform the said contract on
" its part, and failed and neglected, and was unable to pay
" to said Litchfield & Co. the compensation to which they
" had become entitled, and the sums which had become
" due to them under said contract, for the building and
" equipment of said road to Anoka, as aforesaid ; where-
" upon the said company, with a view, among other things,
" of becoming relieved of and from its said obligations to
" said firm of Litchfield & Co., and other pecuniary embar-
" rasments; enabling the said Litchfield & Co. to complete
" and fully perform the said contract on their part without
" risk of loss thereby, and of securing the construction
" and equipment of that and other portions of said railroad,
" did, on the 6th day of February, 1864, in pursuance of the
" provisions of an Act of said Legislature entitled ' An
" Act to amend the charter of the St. Paul and Pacific
" Railroad Company,' approved on the day last aforesaid,
" which had been passed at the instance of said company,
" which is now referred to and made part of this complaint,
" create and issue to E. B. Litchfield, one of the members
" of the said firm of Litchfield & Co., the preferred and
" special stock mentioned and referred to in a certain agree-
" ment, which was afterward, and on the same day, under,
" and pursuant to the act of the Legislature last above men-
" tioned, made and entered into by and between the said
" company and the said E. B. Litchfield, and the said
" Litchfield & Co., which said agreement is in the words
" and figures following, to-wit. "

The agreement mentioned refers to the contract between
the company and Litchfield & Co., and to the Act of Feb-
ruary 6th, 1864, and then proceeds as follows, viz.:    " *And*

" *Whereas,* since the passage of said act there has been
" issued by the St. Paul and Pacific Railroad Company to
" E. B. Litchfield, of the firm of Litchfield & Co. aforesaid,
" certificates of stock for thirty-five hundred shares, of one
" hundred dollars per share, which said shares are created
" and issued under said act as preferred and special stock,
" pertaining to that portion of the road of said Company
" which extends from St. Paul, in the County of Ramsey, to
" Watab, in the County of Benton. *And Whereas,* under
" the provisions of said act, the said St. Paul- and Pacific
" Railroad Company have issued to the said E. B. Litch-
" field, certificates of stock for five thousand shares, of one
" hundred dollars per share, which said shares are created
" and issued under said act as preferred and special stock,
" pertaining to that portion of the road of said company
" which extends from St. Anthony to a point between the
" foot of Big Stone Lake and the mouth of Sioux Wood
" River ; *And whereas,* the said St. Paul and Pacific Rail-
" road Company are desirous of securing the completion of
" the lines of railroad above named with the least possible
" delay,

" *Now therefore,* this agreement, made and entered into
" this 6th day of February, 1864, by and between the St.
" Paul and Pacific Railroad Company, party of the first
" part, and E. B. Litchfield, of the City of Brooklyn, in the
" State of New York, as the owner and holder of the said
" preferred and special stock hereinbefore mentioned, party
" of the second part, *Witnesseth,* that the party of the first
" part, in consideration of the covenants and agreements
" hereinafter mentioned, to be kept and performed by the
" party of the second part, have sold and they do hereby
" sell, assign, transfer and set over unto the said party of
" the second part, all the rights, benefits, privileges, proper-

" ty, franchises and interests of the party of the first part
" as a body corporate, under the laws of the Territory or
" State of Minnesota, belonging to that portion of the lines
" of said company which extends from St. Paul, in the
" county of Ramsey, to Watab, in the county of Benton, a
" distance of eighty miles, together with the lands granted
" by Congress to the Territory of Minnesota, for the pur-
" pose of aiding in the construction of said eighty miles of
" road.  And all the rights, benefits, privileges, property,
" franchises and interests of the party of the first part as a
" body corporate as aforesaid, belonging to that portion of
" the lines of said company which extends from St. An-
" thony to a point between the foot of Big Stone Lake and
" the mouth of Sioux Wood River, together with the land
" granted by Congress to the Territory of Minnesota, for
" the purpose of aiding in the construction of said line of
" road, together with right to extend the line, &c.    *    *
    " And the said party of the first part further agrees, that
" no stock shall be issued, nor any liabilities incurred, either
" general or special, by the said party of the first part,
" chargeable to any portion of the lines of road herein con-
" veyed, except for the purpose and in the manner herein-
" after particularly specified.    *    *    *    And the said party
" of the first part further agrees, that the administration of
" the portions of said railroad, and the land grant apper-
" taining thereto, shall belong solely and exclusively to the
" holder or holders of the special stock hereinbefore named,
" conjointly, as to that portion of said road which extends
" from Saint Paul to Watab, with the holders of stock here-
" inafter provided for.  And that the holder or holders of
" such special stock may form a separate organization for
" the purposes of such administration, with a board of direc-
" tors chosen by the holder or holders of such special stock,

" exercising, in respect to the portions of the road to which " such special stock pertains, all the powers of the St. Paul " & Pacific Railroad Company over the lines of road hereby " transferred, subject only to the provisions of this agree- " ment. In consideration of the foregoing agreements, en- " tered into by the St. Paul & Pacific Railroad Company, " the said party of the second part, for himself, his heirs, " assigns, and successors, agrees to build and complete the " lines of road herein conveyed, as required by the acts of " Congress making the grant of lands in aid thereof, and as " required by the acts of the legislature of the State of " Minnesota. And the said party of the second part, for " the separate organization herein contemplated, agrees to " assume all liabilities of the party of the first part, so far " as the same relate to the lines of road hereinbefore men- " tioned, &c.   *   *   *   And the said party of the second " part further agrees to choose, without unnecessary delay, " a separate board of directors, which said board, under the " name and style of ' The First Division of the Saint Paul " & Pacific Railroad Company,' and their legal successors, " it is agreed by the parties hereto shall exercise, in respect " to the portions of the lines of road hereinbefore trans- " ferred, all the powers of the St. Paul and Pacific Railroad " Company thereunto appertaining, subject only to the pro- " visions of this agreement.

" And the said party of the second part further agrees, " that said board of directors, when so organized, shall, " upon the request of the persons named below, and upon " the surrender of certificates of stock for a corresponding " number of shares in the St. Paul & Pacific Railroad Co., " issue certificates of stock to such persons, which said shares, " when so issued, shall be placed upon an equal footing with " the special stock created and issued to the party of the

" second part, upon that portion of said line, from St. Paul
" to Watab, last above-named, to-wit. (Here follow names,
" &c.)   *   *   *   *   *   *   It is further mutually under-
" stood and agreed by and between the parties hereto, that
" upon the completion of the transfer of the lines hereinbe-
" fore named, pursuant to the terms of this agreement, the
" Saint Paul & Pacific Railroad Company shall be relieved
" from all the terms and conditions of the contract between
" said company and Litchfield & Co., dated May 3d, 1862,
" and the same shall be assumed by the organization con-
" templated by this agreement.   *   * "

The complaint states that Litchfield & Co., by a writing
appended, assented to this agreement, and modified their
contracts for construction, &c., accordingly. The act of
February 6th, 1864, before referred to, and found on *page*
174, *Special Laws*, 1864, authorizes the Saint Paul &
Pacific R. R. Co. to create and issue in such manner, and on
such terms as it may deem expedient, special and preferred
stock, and to make such agreements, as it may deem proper,
with the holders thereof, in reference to the dividends there-
on, and the security for such dividends, and for the appro-
priation of the net earnings of any portion of the railroad
which it may construct or acquire for the payment of divi-
dends on such special stock as may be issued in respect
thereto ; also, to make such agreements as it may deem
proper with the holders of any such special stock as to the
administration of the portion of said railroad, and the land
grant appertaining thereto, to which said stock may pertain;
and for the separate organization of the holders of such spe-
cial stock, for the purpose of that administration, and ena-
bling them, or directors chosen by them, separately, or in
conjunction with the other directors, to exercise, in respect
to the portion of the road to which such special stock may

pertain, all the powers of the company, subject to the provisions of such agreement, when made and entered into.

The complaint proceeds to allege: "That after the execu-"tion of the said agreement, and on the same day last afore-"said the said E. B. Litchfield assigned and transferred a "portion of the stock which had been so issued to him as "aforesaid, to sundry persons, who with him, the said E. B. "Litchfield, did thereupon and on said same day, at the said "City of St. Paul, in accordance with the provisions of said "agreement, and for the purposes therein contemplated, "form and organize the 'First Division of the St. Paul & "Pacific Railroad Company,' and did then and there elect "a Board of Directors therefor, which Board thereafter and "on the same day did elect a President and Vice President, "Secretary and Treasurer of said Company; that a copy of "said agreement, with a report of such organization there-"under, was filed in the office of the Secretary of State, "on the 4th day of May, 1864; that the said agreement "and report and the said 'The First Division of the St. "Paul & Pacific Railroad Company,' are the same agree-"ment, report and Company, mentioned and referred to in "an Act of the Legislature aforesaid, entitled 'An Act to "legalize and confirm the organization, acts and proceed-"ings of the First Division of the St. Paul & Pacific Rail-"road Company, and in relation to the character and "powers of said Company,' approved February 6th, 1866, "(which act is referred to and made part of the complaint) "and that The First Division of the St. Paul & Pacific "Railroad Company, so formed and organized as aforesaid, "is the plaintiff in this action." The Act of February 6th, 1866, above referred to provides as follows:

"*Section* 1. That the holders of the preferred stock and "special stock issued by The St. Paul & Pacific Railroad

The First Division of the St. Paul and Pacific R. R. Co. v. Parcher et al.

" Company, under the authority of an act of the Legislature
" of the State of Minnesota, approved on the 6th day of
" February, A. D. 1864, entitled 'An Act to amend the
" charter of the St. Paul & Pacific Railroad Company,' and
" as recited in the agreement made on the same day, under
" said act, between the said Company and E. B. Litchfield,
" of which agreement a copy, with a report of the organiza-
" tion thereunder, was filed in the office of the Secretary of
" State on the 4th day of May, 1864, under and pursuant to
" an act of the said legislature, approved on the 4th day of
" March, 1864, entitled 'An Act authorizing the registry of
" certain railroad organizations, with the agreements under
" which the organizations were made,'—be and they are
" hereby authorized to use, possess, enjoy and exercise all
" the rights, benefits, privileges, property, franchises, powers
" and interests of the St. Paul & Pacific Railroad Company
" as a body corporate, belonging or pertaining to that por-
" tion of the lines or road of said Company which extend
" from St. Paul, in the County of Ramsey, to Watab, in the
" County of Benton, including all the lands granted by
" Congress to aid in the construction of the road of said
" Company, and which belong or pertain to such portion of
" said road, and all the rights, benefits, privileges, property,
" franchises, powers and interests of the said Company as a
" body corporate as aforesaid, belonging or pertaining to
" that portion of the lines or road of said Company which
" extend from St. Anthony to a point between the foot of
" Big Stone Lake and the mouth of the Sioux Wood River,
" including all the lands granted by Congress to aid in the
" construction of that portion of the lines or road of said
" Company last above mentioned, subject only to the pro-
" visions of said agreement; and subject to all the condi-
" tions and limitations respecting the construction and com-

" pletion of said road, or of any part thereof, imposed by
" existing laws.   *   *   *   *   *   *   *   *   *

" *Section* 2.   The holders of the aforesaid preferred stock
" and special stock, their successors and assigns, are author-
" ized to use, possess, enjoy and exercise all and singular
" the said rights, benefits, privileges, property, franchises,
" powers and interests under the corporate name and style of
" the ' First Division of the Saint Paul and Pacific Rail-
" road Company,' and by that name shall have perpetual
" succession, and shall have and enjoy all the powers, privi-
" leges, franchises and immunities incident to a corporation ;
" may acquire by purchase or otherwise, and hold, convey,
" sell and lease property and estates, either real, personal,
" or mixed; may make and have and use a common seal,
" and alter or renew the same at pleasure ; may sue and be
" sued, plead and be impleaded, answer and be answered,
" defend and be defended against ; contract and be contract-
" ed with, and generally may do and perform all and every
" act and thing which may be necessary or requisite to the
" full enjoyment and exercise of all and singular the privi-
" leges, franchises, powers, rights, benefits, property and in-
" terests by this act, and the said agreement, transferred or
" conferred upon them.

" *Section* 3.—The organization of the holders of said pre-
" ferred stock and special stock, under the name of the
" ' First Division of the Saint Paul and Pacific Rail-
" road Company,' in pursuance of the act of the Legis-
" lature and of the agreement hereinbefore referred to, and
" all the acts and proceedings of said organization, not con-
" trary to law, nor to the terms of said agreement, are here-
" by sanctioned, confirmed and legalized."   *Special Laws*,
1866, *p.* 11.   *The act of March 4th*, 1864, above referred to,

and relating to the registry of railroad organizations, will be found upon *page* 107, *Laws* 1864.

This brings us to the question whether by the arrangement between the St. Paul & Pacific Railroad Company, and Litchfield & Co. and E. B. Litchfield, and the acts of the legislature authorizing and approving that arrangement, the corporate franchise pertaining to that portion of the line of the St. Paul & Pacific Railroad Company transferred through such arrangement, became vested in E. B. Litchfield and the other holders of the special and preferred stock, so that upon their perfecting the organization of the First Division of the St. Paul & Pacific Railroad Company it became a corporation. If so, there was brought into existence a corporation separate and distinct from the St. Paul & Pacific Railroad Company. That the Territorial Legislature in the act incorporating the Minnesota & Pacific Railroad Co. contemplated that the company might find it necessary or convenient, in constructing and operating their road and branches, to make one or more divisions of the road and branches, and thus to organize other corporations, is evident. *Section* 21 of the act authorized and empowered the company, " in its corporate capacity, to make, execute and " deliver one or more mortgages, or deeds of trust, upon " the whole or any part of its railroad or branches, con- " structed or authorized to be constructed, and of the estate " granted by the act, and any or all other of their estate, " real, personal, or mixed, in possession or expectancy ; and " said company is also hereby authorized and empowered " in and by such mortgage or deed of trust, to confer upon " the trustee or mortgagee, full and ample powers to enter " into and upon and to take possession of, have, use, and " employ, or to sell or dispose of the whole, or any part of " said railroad and branches, and all corporate and other

"franchises, rights and privileges of the said company;
"and in case of any such sale, to grant and convey to the
"party or parties acquiring title under any such sale, and
"their associates, successors and assigns, all and the same
"rights, privileges, grants, franchises, immunities and ad-
"vantages in and by such mortgage or deed of trust enu-
"merated and conveyed, which belonged to and were en-
"joyed by the said company, as fully and absolutely in
"every respect as the said company, its stockholders, offi-
"cers and agents might or could have done if such sale or
"foreclosure had not taken place." It is manifest that the
execution and foreclosure of such a mortgage upon a por-
tion of the company's railroad or branches would operate
to authorize the organization of a distinct corporation to
construct and operate the portion of the road or branch
conveyed by the mortgage. The authority to bring into
actual existence a distinct corporation by means of a mort-
gage and foreclosure, was then given to the company by the
act incorporating it. So far the members of the court are
agreed; but from this point my brethren reason as fol-
lows upon this question in the case: The legislature
of the State, under the Constitution, could not by any
special act create, nor authorize the creation of a cor-
poration. But the authority to bring into actual opera-
tion a separate corporation, having been vested by the
Territorial Legislature, whether the State Legislature
could, without infringing the Constitution, empower the
company to exercise that authority in a mode different
from that contemplated by the original act, is a different
question. While the Constitution prohibits the vesting of
a substantial authority to create a new corporation, we do
not think that it prohibits the legislature from regulating
(of course with the assent of those in whom the authority is

vested) the exercise of an authority already vested, to bring into actual existence a separate corporate body; and this we think is all that the State Legislature attempted to do by the acts of February 6th, 1864, and February 6th, 1866. The Company had by its charter authority to bring into actual existence a separate corporation, by means of a mortgage or deed of trust, and a sale or foreclosure—that is by a conditional transfer. We do not think that the legislature transcended its power in consenting to the exercise of this authority by the company through an unconditional transfer. Under the consent of the State Legislature, the arrangement between the St. Paul & Pacific R. R. Co., and E. B. Litchfield and Litchfield & Co., was the exercise of an authority vested by the 21st section of the charter, and constituted the transferees, *i. e.* the holders of the stock, a corporation. These are the views of my brethren upon this question in the case, and while I am not prepared to express an unhesitating dissent from the course of reasoning adopted by them, I prefer to rest my concurrence in the general conclusion reached by them, upon the following grounds: The agreement of February 6th, 1864, was an attempt to make a *division* among stockholders, of the lands, roads, and franchises held by the St. Paul & Pacific R. R. Co. I am of the opinion that by the agreement, and the proceedings thereunder, as alleged in the complaint, and by the act of February 6th, 1866, this division was effected, and that thereupon the First Division of the St. Paul & Pacific R.R. Co. became a corporation, endowed with all the rights, benefits, privileges, property, franchises, powers and interests by said agreement and act purporting to be granted and conferred. The St. Paul & Pacific R. R. Co. assented to this result by the agreement of February 6th, 1864, and the State assented to the same by the act of February 6th, 1866;

and both have still further assented by their acquiescence in the exercise and enjoyment of these rights, franchises, &c., by the First Division of the St. Paul & Pacific R. R. Co. down to this day. But it is objected that this is to form a corporation by special act, which the Constitution of this State forbids. To this I do not agree. The St. Paul and Pacific R. R. Co. held certain roads, lands and franchises. These have been *divided*, so that a portion of them are held by the St. Paul & Pacific R. R. Co., and the balance by the First Division of the St. Paul & Pacific R. R. Co. This division has not produced, nor has it resulted from any in-crease of the franchises originally possessed by the St. Paul & Pacific R. R. Co. What was one whole, is now two parts, the aggregate of which is substantially equivalent to the original whole. No greater, nor other franchises have been bestowed by the State, than the St. Paul & Pacific R. R. Co., a legal and constitutional corporation, possessed. The change which has been made, goes only to the manner in which, and the agencies by which, franchises before grant-ed shall be enjoyed and exercised. This is not, in my opin-ion, the *forming* of a corporation by special act, within the meaning and inhibition of the Constitution. It will be seen that upon this branch of the case my views lead to the same general conclusion as the reasoning adopted by my brethren.

This disposes of the first ground of demurrer. We hold that The First Division of the St. Paul & Pacific R. R. Co. is, upon the state of facts alleged in the complaint, a body corporate, and as such, authorized to sue and be sued.

There is however one other consideration to which we deem it proper to advert upon this branch of the case. The complaint alleges that immediately upon its organization as aforesaid, The First Division of the St. Paul & Pacific R. R. Co. did "proceed with and prosecute, and has ever since

" proceeded with and prosecuted, the construction, com-
" pletion, equipment, and operation of said lines of railroad,
" and had and retained the administration, control and man-
" agement thereof, and of the said land grants, in accordance
" with the stipulations of the said agreement, and with the
" requirements of the laws of this State, of the late Territory
" of Minnesota, and of the United States, relative or pertain-
" ing to said lines of railroad.   And that the said The First
" Division of the St. Paul & Pacific Railroad Company,
" the plaintiff in this action, long since completed all that
" portion of said railroad from St. Paul to Saint Cloud, a
" distance of seventy-six miles, and more than ten continu-
" ous miles of the main line of said road from a point on
" the constructed line in St. Anthony, by the way of Min-
" neapolis, westwardly, with regular trains of cars running
" thereon ; which completion of said road or lines the Gov-
" ernor of said State from time to time, as portions thereof
" were so completed, duly certified to the Secretary of the
" Interior, as authorized and required by law to do, by rea-
" son whereof a large amount of the land so granted," as
aforesaid by Congress, became, and was vested in, and con-
veyed to the plaintiff by the Governor, the same being de-
scribed in the schedule attached to the complaint, and being
the property of, and held and owned by the plaintiff, and
being situate in the county of Wright, &c. &c.   This is the
record which the plaintiff presents ; and without enlarging,
we simply remark, that while considerations drawn from
the state of facts thus presented, ought not, perhaps, to ex-
ercise a *controlling* influence in the determination of a
question of constitutional law, they should certainly compel
a court to pause before pronouncing the plaintiff an usurper,
and denying its authority to exercise the rights and fran-
chises, which it has hitherto exercised under legislative

sanction, to the great advantage of the public, and without any attempt or proceeding upon the part of the sovereign to call its authority in question. Certainly, under such circumstances, the laws and proceedings through which it claims to have acquired its franchises should receive a liberal construction.

We come now to the other branch of this case.

By an act of Congress approved March 3d, 1857, the United States granted to the Territory of Minnesota public lands for the purpose of aiding in the construction of certain lines of railroad. By an act of the legislative assembly of the Territory of Minnesota approved May 22d, 1857, the Minnesota & Pacific Railroad Company was incorporated and endowed with all the powers, privileges, franchises and immunities incident to a corporation. On the 27th day of May, 1857, said company was duly organized and became a corporation under the act last mentioned, and on the same day duly accepted and signified its acceptance of the terms and provisions of said act, thereby assuming, among other things, the obligation to construct and put into operation the railroad which it was authorized to construct, as well as the obligation to pay taxes at the rate and in the manner hereinafter mentioned. By *section* 16 of said act, all the interest and estate, present and prospective, of the Territory, and of the future State which should succeed it, in and to such of the lands granted as aforesaid by the United States as were applicable to the construction of the lines of road which the Minnesota & Pacific Railroad Company was authorized to construct, were granted to said company upon the terms and conditions in said act specified. By *section* 18 of the same act, it is provided that "in consideration of "the grants, privileges and franchises herein conferred on "the said Minnesota & Pacific Railroad Company, the said

" company shall and will, on or before the first day of March
" in each year, pay into the treasury of the Territory or fu-
" ture State, three *per centum* of the gross earnings of the
" said railroad, for the year ending on the last day of the
" preceding December, in lieu of all taxes and assessments
" whatever;   *   *   and for securing to the Territory or
" State the payment of the aforesaid *per centum*, it is here-
" by declared that the State shall have a lien upon the rail-
" roads of the said company, and upon all other property,
" estate and effects of the said company, whether real, per-
" sonal, or mixed, and the lien hereby secured shall take
" and have precedence of all demands, decrees and judg-
" ments against the said company.  The first payment shall
" be made on the first day of March next after fifty miles of
" said road shall be completed, and such payment shall be
" in lieu of all taxes and in full of all claims of the Terri-
" tory or State for the grant hereby made, and in consider-
" ation of such annual payments the said company shall be
" forever exempt from all assessments and taxes whatever
" by the Territory, or State which shall succeed the Terri-
" tory, or by any county, city, town, village or other muni-
" cipal authority in the Territory or State, upon all stock in
" the said Minnesota & Pacific Railroad Company,' whether
" belonging to said company or to individuals, and upon all
" its franchises or estate, real, personal, or mixed, held by
" said company, and said land granted by said Act of Con-
" gress hereby authorized to be conveyed to the said Minne-
" sota and Pacific Railroad Company shall be exempt from
" all taxation till sold and conveyed by said company." The
other act in relation to the taxation of these lands, approved
March 4, 1865, we do not deem it necessary to consider in
this case.  The plaintiff claims that certain lands (being
part of the lands granted as aforesaid by Congress,) of

which it has become the owner under the provisions of the Act of May 22, 1857, before referred to, and under subsequent legislation, not having been sold and conveyed by it, are exempt from taxation. The third ground of the defendant's demurrer, in effect, denies this position.

In support of this ground of demurrer, the defendants argue, first, that the taxing power is a *sovereign* power, and hence, that it is not competent for a legislature to alienate or abridge it unless authorized so to do by the people. The charter granted in May, 1857, constituted a contract between the Territory and the Minnesota and Pacific Railroad Company, one of the terms of which was, that the lands granted in aid of the road should be exempt from taxation till sold and conveyed by the company. That the exemption thus conferred is a contract right, a right which a legislature, in the absence of constitutional inhibition, is competent to grant, and inviolable, has been settled in a series of decisions by the Supreme Court of the United States, so that the matter is not open to discussion. *State of New Jersey vs. Wilson*, 7 *Cranch*, 164 ; *Gordon vs. Appeal Tax Court*, 3 *Howard*, 133 ; *Jefferson Branch Bank vs. Skelly*, 1 *Black.*, 436, *and cases cited.*

The defendants further contend that even if a state legislature could grant an exemption of this nature from taxation, a territorial government is a mere creature of Congress, created for temporary purposes only, and that therefore it has not the power to grant an exemption of this kind. We think that there is nothing in this point. By *sec. 6 of the Organic Act*, it is declared, " that the legislative power of the Territory shall extend to all rightful subjects of legislation consistent with the constitution of the United States and the provisions of this act." The power thus conferred would appear to be ample to sustain the grant of ex-

emption from taxation in this case, and we can perceive no reason why such grant may not be a subject of legislation as *rightful* under a Territorial, as under a State government.

Another point presented by the defendants is that even if the territorial legislature could bind the Territory, it had not power to alienate or abridge the sovereign authority of the future State. The doctrine laid down in *Dartmouth College vs. Woodward,* 4 *Wheaton,* 651, would be a sufficient answer to this position. In that case a charter granted by the King, whose authority had been overthrown by a revolution, was upheld as a contract which could not be impaired by the government of New Hampshire. In the case at bar, the State government was but the successor in a peaceful and regular manner of the Territorial government. But section 1 of the schedule of our Constitution sets this matter at rest, when it says, " That no inconvenience may arise by reason of a change from a territorial to a permanent state government, it is declared that all rights, * * * * and contracts, as well of individuals as of bodies corporate, shall continue as if no change had taken place. " This provision was perhaps unnecessary, but it is at any rate decisive.

The defendants take the position that the territorial legislature was, in effect, prohibited from making grants of exemption from taxation, by section 6 of the Organic Act, which contains this provision, " Nor shall the lands or other property of non-residents be taxed higher than the lands or other property of residents. " It is claimed that the Minnesota and Pacific R. R. Co. was a resident of the place of its creation. But this is by fiction or construction of law. The provision of the Organic Act, as well as a similar provision found in the Act of Congress authorizing the people of Minnesota to form a state government, was designed to

forbid unjust discrimination in favor of residents *in fact*, and against non-residents *in fact*, and has no application to a case of this kind.

It is also urged by the defendants that the exemption from taxation was granted to the Minnesota & Pacific Railroad Company without consideration, and that therefore it does not come within the principle of the decisions of the Federal Supreme Court before cited, but it is rather to be classed among the *privilegia favorabilia* spoken of in *Christ Church vs. County of Philadelphia*, 24 *How.*, 300, and may therefore be revoked at the pleasure of the sovereign. We are of opinion that a sufficient consideration is to be found in the agreement of the Company to construct the road, and to fulfil the other duties imposed by the charter, and among them to pay three *per centum* of the gross earnings of the road into the treasury of the Territory or future State. Whether in making the grant the territorial legislature acted wisely, and upon a just estimate of the value of what was conferred, it is unnecessary for us to consider.

It is further contended that this immunity from taxation was conferred upon the Minnesota & Pacific R. R. Co., personally (so to speak) and for its benefit only, and that it did not pass to the State by the foreclosure and forfeiture. It may admit of some doubt whether the rights conferred upon the Company in respect to taxation are not *franchises* in the authorized sense of the term. 2 *Blackstone Com.*, 37; 2 *Kent. Com*, 458-459; *Bouvier Law Dict.*, *Title Franchise*; *Bank of Augusta vs. Earle*, 13 *Peters*, 595; *The People vs. Utica Ins. Co.*, 15 *Johns.*, 379-387; *Angell & Ames on Corporations*, *Secs.* 4, 737. If these rights are franchises, there is no reason apparent why the State did not acquire them, with the other franchises of the Company, by virtue of the foreclosure and forfeiture. And even admitting that this

immunity or privilege was originally personal to the Minnesota & Pacific Railroad Co., under the provisions of its charter, it was *by virtue of the amendment to the Constitution*, and not by an act of ordinary legislation, permitted to be made the subject of mortgage, and therefore transferable to the purchaser at mortgage sale.

We are, however, of opinion that this privilege or immunity in reference to taxation, is in no greater degree personal to the Minnesota & Pacific Railroad Company, than any other of its rights or franchises.

All the franchises and rights conferred upon the company were granted *for the benefit of the company*, and in that sense were all personal. But we perceive nothing in the language employed in reference to this right, privilege or immunity, to distinguish it, in this respect, from the other rights granted. It would certainly be one of " the privileges, grants, franchises, immunities and advantages," the sale and transfer of which is authorized by the provisions of section 21 of the original charter of the company.

But if this immunity in regard to taxation be not a franchise, in the legitimate meaning of the word, it certainly was, as we have already determined, a *right*, and a *contract right*, to hold the lands exempt from taxation, until the same were sold and conveyed. And as it was not a personal and inalienable right, there is no reason why it would not pass with the lands and as appendant thereto to the State. When the Minnesota & Pacific Railroad Company lost the lands, it lost this right, for it had lost that to which the right related. The question then is, What became of the right? The State took and held what it acquired, not in its sovereign character, but as property, like a private individual; and in this capacity it succeeded to the roads, lands and franchises of the company, and in our opinion to this

330    Cases in the Supreme Court,

The First Division of the St. Paul and Pacific R. R. Co. v. Parcher et al.

immunity from taxation, as appendant to the lands. If this was not the case, then this immunity was merged or extinguished. That it was not the intention or interest of the State to suffer it to be merged or extinguished, but to hold and transfer it for the purpose of facilitating and hastening the construction of the road, is, we think, apparent for the reasons which we have before advanced for the purpose of showing that the State took, held and transferred the corporate and other franchises of the company unmerged and unextinguished.

In addition to what was there said, it is entirely proper for us to refer to the state of things existing when the policy to be adopted was under consideration by the legislature. The State was then almost a wilderness. Its population was small and sparse, its capital limited, its business depressed, its resources undeveloped. There was not a mile of railroad within its borders. An outlet by rail for the products of the State was a matter of prime and pressing necessity. The inducements which we were able to hold out to secure this outlet, and the construction of needed lines of railway, consisted rather in what the State was to be, than in what it was. The country at large had hardly recovered from the financial revulsion of 1856–7. How soon railroads in this State would prove remunerative to their owners, as well as how soon the lands would sell, were matters of conjecture and experiment. And notwithstanding repeated and continued tenders of all the roads, lands and franchises, together with the privileges and exemptions in regard to taxation, it was not until the summer of 1862, that the first ten miles of railway were put into operation in this State. These facts are not without weight in considering whether the grant of lands, without the exemption from taxation, would probably have induced capital to undertake the con-

struction of the roads, especially when we take into account the proverbially high rates of taxation in newly settled communities.

They have as we think, a tendency to show that it was for the interest of the State to hold this exemption unmerged, that it might be enabled to offer it to persons willing to embark in these important enterprises, and thus secure the completion of the same.

The State then having acquired this immunity from taxation, transferred it with the lands to the St. Paul & Pacific Railroad Company, and thereupon that company became entitled to hold such lands exempt from taxation until the same were sold and conveyed by it. From the views before expressed this consequence follows, whether the immunity be regarded as a franchise, or as a right appendant to the lands, and not a franchise. The St. Paul and Pacific Railroad Company thus holding this immunity when the legislation and arrangement were consummated, under which the " First Division of the St. Paul and Pacific Railroad Company" became a corporation, and possessed of the lands, franchises and other property acquired as we have before seen through the same, it acquired this immunity also. There was not, in our opinion, a sale and conveyance of the lands within the meaning of section eighteen of the original charter. The lands are still held by the same body corporate which holds and exercises the corporate and other franchises pertaining to that portion of the road and branch to which the lands to which this action relates are applicable. This same body corporate is carrying on the enterprise, and constructing and operating the road and branch for which the lands were granted, and the immunity from taxation conferred. The transaction between the St. Paul and Pacific Railroad Company, and the holders of the preferred and

The First Division of the St. Paul and Pacific R. R. Co. vs. Parcher et al.

special stock, was not a sale, but rather in the nature of a division or partition of common property.

This is all that we deem it necessary to say upon this branch of the case.

Our general conclusions are—

*First*—That upon the allegations of the complaint, "The First Division of the St. Paul & Pacific Railroad Company," is a corporation, and authorized to sue and be sued as such.

*Second*—That upon the same allegations, it is entitled to hold such of the lands granted by the United States to the Territory by act of Congress of March 3d, 1857, as it has become vested with under the laws and proceedings hereinbefore referred to, exempt from taxation, until the same are sold and conveyed by it.

The order overruling the demurrer interposed below, is therefore affirmed.