STATE *vs.* TRUSTEES OF SOUTHERN MINNESOTA RAILROAD COMPANY.

March 1, 1875.

Railroad Land Grant not Taxable till Lands are Sold and Conveyed.—*State* v. *Winona & St. Peter R. Co., ante* p. 315, followed, and applied to this case.
Same—Certain Instrument held not to amount to Sale and Conveyance.—The effect of certain instruments executed by the Southern Minnesota Railroad Co., (the important portion of which are set out in the opinion,) considered, and the same held not to amount to *a sale and conveyance* of the lands therein mentioned, so as to subject the same to taxation, within the provisions of § 5, ch. 1, Sp. Laws 1864.

So much of the 100,000 acres of land mentioned in the following opinion, as lies in Olmsted county, was listed for taxation, and taxes were assessed thereon for the year 1873. The taxes so assessed remaining delinquent on June 1, 1874, proceedings were instituted in the district court for that

county, under Laws 1874, ch. 1, to obtain judgment against the lands, and a sale of them for non-payment of taxes. The railroad company made default; but the trustees under the various trust deeds mentioned in the opinion, appeared and objected to the validity of the tax, on the ground that the lands were still owned by the railroad company, and were therefore exempt from taxation, having been acquired by the company in a manner similar to that in which the First Div. St. Paul & P. R. Co., the Winona & St. Peter R. Co., and the Minnesota Central R. Co., acquired their lands, which have heretofore been held to be exempt from taxation. See *First Div. St. P. & P. R. Co.* v. *Parcher*, 14 Minn. 297; *Huff* v. *Winona & St. P. R. Co.*, 11 Minn. 180; *State* v. *Winona & St. P. R. Co.*, ante p. 315; *Minn. Central R. Co.* v. *Melvin*, ante p. 339.

The district court, *Mitchell*, J., presiding, decided *pro forma* against the trustees, and certified the case to this court under § 120, ch. 1, Laws 1874.

*Geo. P. Wilson*, Attorney General, and *Chas. M. Start*, for the State.

*H. J. Horn* and *Gilfillan & Williams*, for defendants.

BERRY, J. Most of the questions mooted in this case are disposed of in our opinion filed in *State* v. *Winona & St. Peter. R. Co.*, ante p. 315. The only question remaining to be considered arises upon the following facts:

By § 5, ch. 1, Sp. Laws 1864, it is enacted that certain lands granted to the Southern Minnesota Railroad Company, of which the lands to which the present proceeding relates are a part, "shall be and are hereby exempted from all assessments and from all taxation whatsoever, until the same shall have been sold and conveyed by the said company."

On August 8, 1864, said company, as party of the first part, executed and delivered to Ruggles and Man, as trustees and parties of the second part, a deed of trust, by way of mortgage, to secure certain bonds of the company, to the amount of $1,000,000. This deed of trust, (called Ex-

hibit A,) covered all the property and franchises of the company, and, among other things, " all the lands acquired, or which may hereafter be acquired, by " the company, " through or under any land grant, or other act of congress of the United States, or of the said State of Minnesota."

On April 1, 1868, the only bonds outstanding and secured by the trust deed of August 8, 1864, were four hundred and fifty, of $1000 each. On said first day of April, the company, as party of the first part, executed and delivered to Ruggles and Man, as parties of the second part, an instrument, (called Exhibit C,) so much of which as is important to be referred to, reads as follows, to wit:

" *Whereas* the said company has executed four hundred and fifty obligations or certificates of special trust, to bear date as they may respectively be issued, and which are to be issued by the said parties of the second part, in part substitution for certain bonds of said company which were secured by the mortgage made by said company to the same trustees, on the eighth day of August, one thousand eight hundred and sixty-four, each of which certificates represents one thousand dollars of the original debt secured by said mortgage, which debt was contracted for the construction and equipment of the railroad of said company, and which certificates are intended as evidence of, and to be secured by a mortgage or special trust, in respect to one hundred thousand acres of the land now belonging to the company, and covered by said former mortgage: *And whereas* the said certificates constitute a present indebtedness of said company, to the extent of four hundred and fifty thousand dollars, but which, by arrangement with the holders thereof, is payable through the said trustees, and by and from the proceeds of said lands only, the said lands to be held and disposed of in like manner, substantially, as was specified in said former mortgage, and the net proceeds thereof to be received by said trustees, and paid by them to the holders of said certificates in satisfaction thereof: *Now this Indenture witnesseth*, that the party of the first part, in consideration

of the premises, and the sum of one dollar to it duly paid by said parties of the second part, (the receipt whereof is hereby acknowledged,) and in order more fully to secure the performance of the aforesaid certificates, and the payment and satisfaction thereby of the said indebtedness, hath granted, bargained, sold and conveyed, and hereby doth grant, bargain, sell and convey unto said parties of the second part, their successors and assigns, one hundred thousand acres of the land now belonging to the said company, or to which it is entitled by reason of the construction of the first thirty miles of its road, being exclusive of the land which is embraced in its roadway, or which is in use, or is necessary to be used for depots, turn-outs, water stations, machine shops, and other purposes immediately connected with the operating of its road; and which quantity of one hundred thousand acres is to be ascertained by commencing at the Mississippi river, and extending westward by ranges, (and from south to north in the extreme range,) as far as may be necessary to make up the required amount. To have and to hold the said lands unto said parties of the second part, and the survivor of them, their successors and assigns, forever, but upon condition, and by way of mortgage or trust only; that is to say, as security for the payment of the moneys, and performance of the trusts expressed in the said four hundred and fifty certificates executed by the parties of the first part, and to be satisfied and become void as soon as the same shall have been fully paid and performed. And it is further provided and agreed that the said lands shall be subject to the same mode of appraisement for purposes of sale as provided in said mortgage of the eighth day of August, one thousand eight hundred and sixty-four, and shall and may be sold and conveyed in like manner by the party of the first part, provided the parties of the second part or the survivor of them, or their successors or assigns, shall concur in such sales by releasing all existing lien or liens created by said former mortgage, and by the present indenture, upon any lands so sold.

It is also expressly agreed, as the true intent of the present indenture, that notwithstanding the creation of said special trust, and the surrender of the said bonds for cancellation, the lien of said mortgage of the eighth day of August, one thousand eight hundred and sixty-four, and all appropriate remedies under the same, shall continue in full force in respect to the said one hundred thousand acres of land, and in favor of said trustees and their survivor and successors, but only for the protection and security of the holders of said certificates, each of which for this purpose shall represent the full sum of one thousand dollars. And it is further provided and agreed that either of the said trustees or their successors, in case of absence or temporary inability to act in person, may effectually empower the other, or any other suitable person, to act for him and as his attorney, in the execution of, or in any matter pertaining to, the trusts or powers created by this indenture. It is also provided that the parties of the second part, their survivor or successors, shall have power to appoint an agent or agents, for the purpose and with power to execute good and effectual releases of any lands which may be sold as aforesaid. And it is further provided and agreed that nothing herein contained shall prevent the parties of the second part, or the survivor of them, or their successors, from adopting any legal remedy whatsoever, by foreclosure, or otherwise, for enforcement of the liens or charges aforesaid upon the said lands.''

A sample (Exhibit D) of the certificates mentioned, so far as its contents are important in this case, reads as follows, viz:

'' These presents are to certify: 1. That the grantee of this certificate has surrendered for cancellation mortgage bonds of the Southern Minnesota Railroad Company, issued under its mortgage of the eighth day of August, 1864, to the amount of one thousand dollars. 2. That such surrender is made pursuant to an arrangement between the said company and certain of its bondholders and the undersigned

trustees for bondholders, whereby the lands derived by the company under its land grants, and remaining unsold, to an amount not exceeding 100,000 acres, shall stand appropriated, as a special trust, to the use and benefit of the various persons surrendering such bonds, and to such extent as, at the rate of $4.50 per acre, will suffice to pay and satisfy the bonds so surrendered. 3. That the holder of this certificate will accordingly be entitled to receive such proportion of the proceeds of the lands so appropriated, as the said one thousand dollars shall bear to the whole amount of bonds which shall be surrendered to be cancelled under the terms of the said special trust. 4. The lands embraced in this special trust will continue to be held by the company and the trustees in the same manner as at present, (being free from taxes until sold,) the sales to be effected in the same manner, substantially, as heretofore, and the net proceeds to be divided and paid, from time to time, by the trustees, to the holders of this and the like certificates *pro rata.* 5. The sales to be regulated, as nearly as practicable, in manner following, viz : so as to yield an amount at least equal to seven per cent. interest during each of the first two or three years ; and afterwards, (unless for extraordinary cause, or upon advice of a majority in amount of the certificate holders,) to be made with such speed as to close all the sales within the further term of two or three years, though allowing additional time, if necessary, to close the collections. 6. The trustees to have the right, (should it be deemed necessary,) to allow usual and reasonable commissions to agents for effecting sales, and also to be entitled themselves to like commission as at present (three per cent.) upon the amount of sales. 7. In case the bonds surrendered under the present trust shall fall short of the full amount ($450,000) which the said lands, at the rate aforesaid, will suffice to pay, then only such amount of land as, at that rate, will satisfy the bonds so surrendered, shall be set apart for that purpose, beginning from the Mississippi river, and extending westward, by ranges, as far as may be

necessary to make up the required amount. 8. The dividends under this trust, unless otherwise specially advertised, are to be paid semi-annually, the first of December and June, on presentation of the certificates, at the office of the trustees in the city of New York."

Of the 450 bonds, 225 were surrendered by the holders thereof, in exchange for certificates. The remaining 225 are still outstanding, and secured by the trust deed of August 8, 1864. This trust deed (Exhibit A) is therefore still subsisting and unsatisfied, and covers, as has already appeared, the 100,000 acres of land covered also by Exhibit C, no part of the same having been released from the lien of Exhibit A.

Reading Exhibits C and D together, as parts of one and the same transaction, we are of opinion that their proper construction is as follows : The evident purpose was that the bondholders who exchanged their bonds for certificates, should receive the proceeds of such a proportion of the 100,000 acres of land, as the number of bonds so exchanged bore to the four hundred and fifty originally outstanding. It is equally evident that these proceeds were to be the proceeds of the unincumbered, *entire title* of this proportion of the 100,000 acres, not the proceeds of a title subject to the incumbrance of Exhibit A. If all of the 450 bonds had been surrendered, and certificates accepted in their place, we are by no means prepared to take the position that Exhibits C and D would not, in substance and effect, have operated as a sale and conveyance of the 100,000 acres of land, within the meaning of the charter provision before cited. § 5, ch.1, Sp. Laws 1864. In such case, although, under the provisions of Exhibit C, the lien of the mortgage created by Exhibit A would have been preserved, it would have been preserved for the benefit of the certificate holders only. They would, through the medium of the trustees, hold the fee of the lands, subject only to a mortgage in favor of themselves. In fact and effect, then, there would be nothing to prevent the complete fulfilment of the purpose for which Exhibits

C and D were executed; or, in other words, nothing to prevent them from operating so as to confer upon the certificate holders an absolute and perfect right to the proceeds of the sale of the unincumbered, entire title to the 100,000 acres of land. Under such circumstances, it certainly might well be contended, to say the least, that the company had *sold and conveyed* the 100,000 acres.

But the case supposed is not the case at bar. The right of the 225 certificate holders who have surrendered their bonds in exchange for certificates, is not a right to the proceeds of the unincumbered, entire title to an undivided half of the 100,000 acres, (as contended by the counsel for the State,) or to the proceeds of the unincumbered entire title to 50,000 acres, in severalty, (under the provisions of the 7th clause of Exhibit D;) but it is, at most, nothing more than a right to the proceeds of the fee, subject to the lien of the mortgage created by Exhibit A, not only in their own favor, but in favor of the 225 bondholders whose bonds are still outstanding. But Exhibit A contains the following provisions respecting the authority and duty of the trustees: " And it is further provided and agreed that it shall be lawful for the party of the first part, by and with the consent of the parties of the second part, their survivor or successors, or upon such terms as shall have been approved by them, to effect sales, from time to time, of any of such lands, at prices not less than the then existing minimum valuation of the same; and such sales may be made either for cash, or for any of the bonds aforesaid, at not more than their par value, or partly for cash or bonds, and partly upon credit, such credit not to exceed five years, and the balance in such case to be secured by contract or mortgage; but upon effecting any such sale or sales, the same and the terms thereof shall be certified to the parties of the second part, their survivor or successors, and upon the completion of any purchase, by full payment, or by payment of part and mortgage for the residue, the parties of the second part, their survivor and successors, shall and will execute a re-

lease of the land so sold, discharging it from the lien of the present indenture, upon receiving, or when they shall have received from the purchaser, (either directly or through the party of the first part,) the full price of the land so sold; or if the same shall have been sold upon credit, then upon receiving not less than twenty-five per cent. of such price, with the personal obligation of the purchaser for the residue, secured by approved mortgage of the premises so sold.

" And it is further provided that the parties of the second part, their survivor or successors, shall have power to appoint an agent or agents, for the purpose and with power to execute good and effectual releases of any lands so sold.

" And it is further provided and declared that the proceeds of all the lands so sold shall constitute a sinking fund for the payment and redemption of the aforesaid mortgage bonds, and it shall be, by the parties of the second part and their survivor or successors, faithfully applied to that object; and until such moneys shall be so applied, the same shall be deposited in the city of New York, upon the best terms which can be procured for the same, to the credit of the parties hereto of the second part, their survivor or successors; and whenever, from time to time, there shall be any money so on deposit, said parties of the second part, their survivor or successors, may, in their discretion, apply the same to the purchase or redemption of so many of the aforesaid bonds as such moneys shall from time to time be adequate to redeem, but at rates not exceeding the par value of the said bonds, it being hereby made the duty of said trustees to purchase or redeem the same, upon such terms as will be most advantageous to the party of the first part; and in case such bonds cannot be obtained and redeemed without paying more than the par value, and the said trustees shall have in hand more than $10,000 applicable for that purpose, it shall be their duty to advertise in two newspapers of general circulation in the City of New York, for not less than twenty days, for proposals for the sale or rendition for redemption of bonds to the amount so on hand,

and from the proposals so received, to accept those which shall be most advantageous to said company."

From these provisions of Exhibit A, it will be apparent that the obligations of the trustees to the holders of the 225 outstanding bonds are such as to deprive them of the power of securing and appropriating to the certificate holders the proceeds of the unincumbered, entire title to either an undivided half of the 100,000 acres, or of 50,000 thereof in severalty, at least until these 225 outstanding bonds are taken up, or their lien upon the 100,000 acres in some way satisfied or discharged.   In other words, Exhibits C and D are so subjected to and controlled by Exhibit A, that the purpose with which they were executed has never been fully carried into effect ; that is to say, they have never become operative, so as to pass to the holders of the certificates, or the trustees for them, the right to the proceeds of the entire, unincumbered title, either to the undivided half of the 100,000 acres, (as contended by the counsel for the State,) or to the 50,000 acres thereof in severalty, to which, as it seems to us, it was contemplated that they should be entitled, under the better construction of the 7th clause of Exhibit D.   Whatever, then, may be the effect of Exhibits C and D, or the rights of the certificate holders thereunder, we are clear that they do not operate as a *sale and conveyance* of any part of the 100,000 acres of land, and, as a consequence, they do not render any part of said lands subject to taxation.

The *pro forma* judgment of the court below to the contrary is therefore reversed, and the lands discharged from the taxes assessed upon them, and attendant penalties, costs and disbursements.