OF THE

## TERRITORY OF DAKOTA.

---

### MAY TERM, 1882.

---

PRESENT:

Hon. ALONZO J. EDGERTON, CHIEF JUSTICE.
Hon. JEFFERSON P. KIDDER,
Hon. GIDEON C. MOODY, } ASSOCIATE JUSTICES.
Hon. SANFORD A. HUDSON,

---

## WINONA & ST. P. R. R. CO. v. THE COUNTY OF DEUEL, ET AL.

1. TAXATION: EXEMPTION FROM. It was within the power of the Legislature of the Territory of Minnesota to exempt railroad lands from taxation until sold and conveyed by the railroad company. And such a provision in the charter of an incorporation constitutes a contract which cannot be impaired by subsequent legislation.

Winona & St. P. R. R. Co. v. The County of Deuel, et. al.

2. SAME: DIVISION OF TERRITORY. And the subsequent division of the Territory of Minnesota does not forfeit or affect such contract rights of the corporation as to taxation of lands situated in that part of the Territory incorporated into the Territory of Dakota.

3. MERGER: The corporation mortgaged all its property, franchises, privileges and immunities, including the contract right of exemption from taxation; such mortgage was legally foreclosed, and all such property, franchises, privileges and immunities were bid in by the Governor, and were by him transferred to the State of Minnesota; at the time of such purchase and transfer the lands in controversy had become a part of Dakota Territory; the state regranted such property, franchises, privileges and immunities to plaintiff; it being admitted by the pleadings that the State of Minnesota intended to hold and regrant without merger or extinguishment all the mortgaged property, franchises, privileges and immunities; *held*, that the right of immunity from taxation as to such lands was not merged, but was conveyed to and acquired by the plaintiff corporation.

*Appeal from the District Court of Deuel County.*

The facts are fully stated in the opinion of the Court.

*Parsons & Runnells*, for defendant and appellant.

POINTS IN BRIEF: As to the effect of the grant by the territory of Minnesota to the Transit Company, we suppose that beyond the first one hundred and twenty sections, it was only to give it title *pari passu*, as the lands were earned. That not having title to these lands, Section four of the Act providing for immunity from taxation never became operative ; *Farnsworth et al v. Minn. & P. R. R. Co.*, 2 Otto, 65 ; *Schulenberg v. Harriman*, 21 Wal., 59 ; *C. R. & M. R. R. Co. v. Carroll County*, 41 Iowa, 153.

CONCEDE: 1. That the lands would have been exempt from taxation in the hands of the Transit Company.

2. That the grant to the Company was a *contract* within the meaning of the Constitution of the United States and of the State of Minnesota.

The territory of Minnesota received the lands from the general Government in trust. It granted them in trust; its grantee failed to perform the conditions of the grant, both to it and the territory, and thereupon the territory, which had then become a State, took the lands back.

What then, is there by which the State can say that it has thrown off its character as *Trustee*, and put on that of owner?

As the trust was political rather than judicial, it might have held the lands and not have executed it; but when it parted with the title, its grantee could only acquire title in accordance with the terms of the grant. To this effect we understood *Farnsworth v. R. R. Co.*, and many other cases.

While the lands were held by the State as trustee of the general Government they would not be subject to taxation *wherever situated*; so long as held by it in any character, those within its own borders would not be subject to taxation; and the fact that it purchased them under a foreclosure against one who held them exempt from taxation would not affect the question. To this effect is *Trask v. Maguire*, 18 Wall., 391.

The question then is: Could the State of Minnesota, at the date of its grant to *plaintiff*, March, 10, 1862, by contract or legislative grant bind the Territory or future State of Dakota?

We submit that *ipso facto* upon the organization of the territory of Dakota, March, 2, 1861, all the lands within its territorial limits not exempt from taxation by the laws of Congress became immediately subject to such laws as Dakota might pass upon the subject, unless there were *then* valid outstanding contracts which it had inherited from the parent territory of Minnesota; and that as to such contracts it was bound to such obligations only as were then existing, and that it was not competent for the territory of Minnesota at any time after it had ceased to have legislative power over the territory of Dakota, to renew, modify or extend such obligations.

3. Assume that in all the foregoing we are in error; what then, was the effect of the foreclosure?

We should answer, it reinvested in the State the rights of *property* with which it had parted, and extinguished all contract rights which its grantee, by its purchase had acquired. If this is not true we have the anomaly of an existing contract *with but one* party. That this could not be so as to individual contracts admits of no argument; if it may be so as to a state it can only be upon the idea that states and parliaments are not only omnipotent, but impersonal. To give it this effect certainly requires legislative as distinguished from contracting power, which brings us again to the question whether the territory of Minnesota could legislate by acts having only a future effect, so as to bind a succeeding sovereignty, and create rights, not *present*, but to arise in the future, which should survive the extinguishment of the contract of which they were a part.

We may safely assume that the contract with the Transit Company would have been at an end by the forfeiture and foreclosure if it had not been kept alive by some other act or agreement.

What was that act or agreement, and what power had the party making it, *at that time*.

I suppose the answer to be, *the act of August 12, 1858*.

There can be we submit, but one answer as to the power which the State of Minnesota then had. *It was precisely such, and no other or greater, as a private individual, acting as the trustee of the general government, would have had.*

Its powers of sovereignty as to these lands were at an end. It could sell or dispose of them as provided by the act of congress, as an individual might have done. It could grant privileges and immunities as against itself, but beyond its own territorial jurisdiction it was as powerless to grant immunities as to these lands against the territory of Dakota, as it would have been over the government buildings in the District of Columbia.

Among the cases that settle or recognize the principles that we concede to be favorable to the plaintiff, are: *Railroad Company v. Reid*, 13 Wall., 264; *Humphrey v. Pegues*, 16 id., 244; *Morgan v. Louisiana*, 3 Otto, 217; *Railroad Co., v. Gaines*, 7 id., 697; *Railroad Co., v. County of Hamblen*, 12 id., 273; *Railroad Co. v. Commissioners*, 13 id., 1; *Wilson v. Gaines*, 13 id., 417.

None of these cases, we submit, go in any respect beyond what we have conceded, and through all of them runs the thought, that exemption from taxation, being an immunity from the general rule, should be clearly made out by the party claiming the exemption. Among the cases which we think somewhat favorable to us are : *Rice v. Railroad Co.*, 1 Black, 361; *Thompson v. R. R. Co.*, 7 Wall., 590-91; *Trask v. Maguire*, 18 id., 391; *Schulenberg v. Harriman*, 21 id., 44; *Farnsworth v. Railroad Co.*, 2 Otto, 49; *Merriwether v. Garrett*, 12 id., 472.

*Thomas Wilson* for plaintiff and respondent.

As it cannot be questioned but that it is competent for the Territory or State by which such corporation is created and in which it exists, to authorize it to mortgage all its property, franchises, privileges and immunities, the single question in this case would seem to be whether a mortgage of the "*property, franchises, privileges and immunities*" of the Company carried and covered the privilege or immunity of exemption from taxation.

This question must be answered in the affirmative whether we consider the natural and ordinary signification of the terms used or the decisions of the highest courts of the United States and different States. See *L. & N. R. Co. v. Gaines*, 3 Fed. Rep., 266; *Humphrey v. Pegues*, 16 Wall., 244; 16 How., 369, 380, 382, 387, 390; 8 Wall., 420; 13 Wall., 264; 20 Wall., 36; *Morgan v. Louisiana*, 93 U. S., 217; *R. R. Co. v. Gaines*, 97 U. S., 697; *St. Paul & Pac. R. R. Co. v. Packer*, 14 Minn., 297, 329; *State*

*v. W. & St. P. R. R. Co.*, 21 Minn., 315; *State v. Trustees, &c.*, 21 Minn., 344; *Railroad Co. v. Hamben*, 102 U. S. 273; *Railroad Co. v. Comr.*, 103 U. S., 1.

It is not claimed that any law of the State of Minnesota affects or could affect the rights of the Territory of Dakota. The law of the Territory of Minnesota, of which Dakota was then a part, exempted these lands from taxation for a valuable consideration to it paid therefor. The law was and is a contract, the obligation of which cannot be impaired by subsequent legislation, as the authorities above cited clearly show.

Whether the law of the State authorized the State, or the Governor for the State, to bid in at the mortgage sale the "lands, franchises, privileges or immunities" mortgaged by the Transit Railroad Company, and to hold the same without merger or extinguishment and to regrant them, is a question that did not touch the interests or rights of the Territory of Dakota any more than would a law which had authorized a married woman, minor or trustee (for the benefit of his *cestui que trust*) to purchase, hold and sell such property. That is a question of State policy, which did not make, or tend to make, the lands taxable, or exempt from taxation. The rights of the Territory as to the taxation of these lands, are not different from what they would be if a natural person had purchased instead of the State.

When a State descends from the plane of its sovereignty and contracts with private persons, it is regarded *hac vice* as a private person itself, and is, as to that transaction, to be so treated and considered: *Hall v. Wisconsin*, 103 U. S., 11; *Davis v. Gray*, 16 Wall., 232; *Curran v. State of Ark.*, 15 How., 308, 309; *St. Paul & Pacific R. R. Co. v. Parcher*, 14 Minn., 303, 304, 329, 330; *U. S. Bank v. Planter's Bank*, 9 Wheaton, 906, 907.

The question of merger is one purely of intention declared or presumed. Therefore it is competent to refer to the acts of the Legisla-

ture of the State of Minnesota to show whether it did intend to hold the franchises and privileges without merger or extinguishment or not: *Davis v. Pierce*, 10 Minn., 378; *Horton v. Moffitt*, 14 Minn., 293; *Railroad Co. v. Parcher*, 14 Minn., 304.

That the exemption from taxation conferred by the laws above referred to is a *contract right*—a right which the Legislature in the absence of constitutional inhibition is competent to grant, and which is inviolable, is no longer an open question. *Railroad Co. v. Parcher*, 14 Minn. 326; *Davis v. Gray*, 16 Wal. 232, and other cases cited in fourth subdivision of brief.

This being so, and the plaintiff (and its predecessors in interest) having in all respects performed on its part, it would be shocking to our sense of justice and at variance with the most clearly settled fundamental principles, to deprive it of the rights secured by the contract and paid for.

The construction of the State Courts of its own Statutes and Constitution is conclusive on the U. S. Courts and Courts of other States and Territories. *Falckner v. Hart*, 82 N. Y., 421; *Jessup v. Carnegie,* 80 N. Y., 441, 447, and cases cited; *Hunt v. Hunt*, 72 N. Y., 236, 237, and cases cited; *Walker v. State Harbor Com.*, 17 Wal., 648, 650, 61; *Secomb v. R. R. Co.*, 23 Wal., 108, 117; *Town of South Ottawa v. Perkins*, 94 U. S., 266, 267; *Peik v. Chicago Railroad Co.*, 94 U. S., 178; *County of Leavenworth v. Barney*, 94 U. S., 71; *Adams v. Nashville*, 95 U. S., 21; *Township of Elmwood v. Marcy*, 92 U. S., 289, 294 ; *The Bark Prince Alexander*, 8 Benedict 209 ; *Fairfield v. County of Gallatin*, 100 U. S., 47, 51, 52 ;

That the grant of lands to the Territory of Minnesota and by the Territory to the Transit R. R. Co., were *grants in presenti* is now well settled. *Schulenberg v. Harriman*, 21 Wal., 60, 62 ; *Lawrence R. Co. v. U. S.*, 92 U. S., 739, 741, 742, 748, 749 ; 9 Opinion of Attorney General, 254-5 ; *French v. Fegan*, 93 U. S., 169, 170 ; *Cent. Pac. R. v. Dyer*, 1 Sawyer 642, 651 ;

The appellant not having brought up the evidence on which the Court below found the facts, and decided the case, all presumptions not absolutely unreasonable are against the appellant, and in favor of the respondent. *Veile v. T. & B. R, Co.*, 20 N. Y. 184, 186 ; *People v. Whitney*, 53 Cal., 420, 421 ; *Grant v. Morse*, 22 N. Y., 323, 324 ; *Brant v. Turner*, 47 N. Y., 96 ; *Acker v. Carver*, 23 Minn., 567, 568 ; *City of Allegheny v. Nelson*, 25 Pa. St. R., 332.

KIDDER, J.—This suit was brought to enjoin the enforcement of taxes against certain lands owned by the plaintiff, and which are part of the land grant made by the United States to the Territory of Minnesota to the Transit Railroad Company, to whose rights the plaintiff claims to have succeeded. The plaintiff claims that these lands are exempt from taxation until it sells or contracts to sell them. This the defendants deny.

The facts on which the decision of this question depends are fully stated in the findings of the Court below, the case having been tried by the Court without a jury. The correctness of these findings of facts is not questioned by either party. Indeed, the attorneys for all the parties have expressly agreed to their correctness. The question is, therefore, one of law, pure and simple.

The material facts found and admitted may be thus briefly stated : The Transit Railroad Company, a corporation created by the laws of the Territory of Minnesota, was authorized to construct and operate a line of railroad from Winona, in said Territory, westerly by way of St. Peter to a point on the Big Sioux River south of the 45th parallel of W. latitude—all of which line was within the Territory of Minnesota.

By an Act of Congress approved March 3d, 1857, the United States granted to the Territory of Minnesota for the purpose of aiding in building said line of road every alternate section of land,

designated by odd numbers, for six sections in width on each side of the line of road, with the right to receive indemnity, &c.

By an Act of its Legislature approved May 22d, 1857, the Territory of Minnesota granted to the said Transit Railroad Company, subject to the conditions in the act expressed, all the interest and estate present and prospective, of the Territory or future State in and to any and all of said lands ; and by the said Act, it was, for the consideration and on the conditions therein expressed, provided and enacted, that the lands thereby granted were, and should be exempt from taxation until conveyed by the said Company. The Transit Railroad Company relying upon the grant to it, accepted the Act and entered upon the building of the line of road. The Transit Railroad Company was one of the "land grant railroads" of the State of Minnesota, and as such received from the State a loan of five hundred thousand dollars, to secure. which it issued to the State of Minnesota its first mortgage bonds to the amount of the debt, and granted, bargained, sold, transferred and assigned to certain trustees to be by them held in trust, the entire railroad built or to be built, and " all right, property, " privileges, franchises and immunities of said Transit Railroad " Company of every nature and kind whatever which were then " owned by the said Company, or which should thereafter be " acquired or owned by it, and all right, title, interest or claim " either legal or equitable, which the said Company had or which " it should afterwards acquire in or to any lands under the afore- " said Act of Congress or under any of the Acts of the Territory " of Minnesota above referred to ; and authorized the said trus- " tees, in case the said Transit Railroad Company should fail to " pay the principal or interest as the same became payable, to " enter upon and take possession of all and singular the rights " and interests, property, privileges, franchises and immunities " granted in trust as aforesaid, and to sell and dispose of the same " for the payment of the said principal and interest, as in said.

" trust deed provided ; and to make, execute and deliver to the
" purchasers a good and sufficient deed of conveyance of the same.
" And, in case of neglect or refusal of said trustees to enter upon
" and take possession of, and foreclose said trust deed, then the
" Governor of the State of Minnesota, was in and by said trust
" deed, authorized to make or cause to be made such sale and
" foreclosure for the purpose aforesaid. "

The Transit Company having made default, and the trustees
having neglected and refused to foreclose, the Governor of the
State of Minnesota, on the 23d day of June, A. D. 1860, after hav-
ing given due and legal notice, caused to be sold, at public auction,
and did bid in and purchase, for, and in the name of the
State, " *all the property, rights, privileges, franchises
and immunities pledged in said deed of trust;*" and
did, on the 16th day of October, 1860, transfer and convey
the same to the State of Minnesota ; * * and the State thereupon
claimed and intended and assumed to hold the same without
merger or extinguishment. And, on the 10th day of March, A.
D. 1862, the State by an Act of its Legislature granted, trans-
ferred and conveyed to William Lamb and others, as a Board of
directors of the Winona & St. Peter Railroad Company, " *all the
property, interest, corporate rights, privileges and franchises of,
or which before had belonged to, the said Transit Railroad
Company.* "

" The plaintiff has and prior to the assessment of the taxes
referred to had, surveyed, located, constructed and completed, and
did, within the times and in the manner specified and required by
the laws of the Territory and State of Minnesota and the United
States aforesaid, survey, locate, construct and complete a line of
railroad from Winona westerly on the most feasible route by way
of St. Peter, to the Big Sioux River south of the 45th parallel of
north latitude, and has, in all respects complied with the several
acts of Congress and of the State and Territory of Minnesota in

respect to building of said railroad from Winona westerly via St. Peter to the Big Sioux River and has, in all respects, complied with and conformed to the provisions, conditions, and requirements of the several acts of Congress granting lands to aid in the building of such road."

The Governor of the State in pursuance of the laws of the Territory and State, has conveyed the land in question, to the plaintiff (which are part of the lands granted as aforesaid), and the plaintiff has not sold or contracted to sell them.

The defendants, claiming the right under a law of the Territory of Dakota, have attempted to tax and are about to sell for delinquent taxes these lands.

From these facts two questions arise: 1. Was it within the power of the Legislature of the Territory of Minnesota to exempt these lands from taxation, until they should be sold and conveyed by the Railroad Company, and, if it had such power, did it exercise it?

2. If it had that power and did exercise it, did the plaintiff succeed to this privilege or immunity of exemption from taxation?

I think that both of these questions must be answered in the affirmative, for reasons which I shall briefly state :.

As to the power of the Territory of Minnesota to grant such privileges and to bind itself and its successors by its contract to that effect, the question is not new. The following cases are directly in point in favor of the existence of such power : *St. Paul & Pacific Railroad Co. v. Parcher*, 14 Minn., 297; *State v. W. & St. P. R. Co.*, 21 Minn., 315; *State v. Trustees, &c.*, 21 Minn., 344.

These are adjudications under the very acts of the Legislature of the Territory and State of Minnesota here to be considered. On principle it is difficult to see how any other conclusion could be arrived at. The United States had the sole power of legislating over or for the Territory of Minnesota, and it could and did delegate that power to the Territorial Legislature.

By the organic act of the Territory, it was provided as follows :

" Sec.    4.    That the Legislative power and authority of said " Territory shall be vested in the Governor and a Legislative " Assembly.    *    *    *

" Sec. 6.    *And be it further enacted:*    That the Legislative " power of the Territory shall extend to all rightful subjects of " Legislation, consistent with the Constitution of the United " States and the provisions of this act ; but no law shall be passed " interfering with the primary disposal of the soil ; no tax shall " be imposed upon the property of the United States ; nor shall " the lands or other property of non-residents be taxed higher than " the lands or other property of residents.    All the laws passed by " the Legislative Assembly and Governor shall be submitted to " the Congress of the United States, and if disapproved shall be " null and of no effect : 9 U. S. Stats. at large, 404."

Here is the most ample grant of legislative power.    It includes all the legislative power, and extends to *all rightful subjects of legislation.*    The only limitation is that the Congress of the U. S. might disapprove of any law, in which case it should be null and void.    Not only is the grant of legislative power unlimited, but this proviso implies that, when Congress did not disapprove, it approved and affirmed the laws of the Territory.

This is the letter and spirit of this Statute, and it is in accordance with the understanding of the bar and the bench for over a quarter of a century; and millions—yes, many millions—of dollars have been invested in the State of Minnesota on the faith and belief that the Territorial legislature possessed such power, and we have yet to learn that in a single case the power has been ever questioned.

The Legislature of the Territory of Minnesota having had unlimited legislative power, subject only to the disapproval and veto of its acts by Congress, it is no longer an open or debatable ques-

tion, that it could grant such privileges, franchises and immunities as the plaintiff claims, and having enacted such a law it became a contract inviolable and irrepealable by any subsequent legislature: *Davis v. Gray*, 16 Wall., 249.

In *Humphreys v. Pegues*, 16 Wall., 249, the Supreme Court of the U. S. employs this language :

" Another question is raised, to-wit : That a legislature does " not possess the power to grant to a corporation a perpetual im- " munity from taxation. It is said that the power of taxation is " among the higher powers of a sovereign state ; that its exercise " is a political necessity, without which the state must cease to " exist, and that it is not competent for one legislature, by binding " its successors to compass the death of the State. It is too late " to raise this question in this Court. It has been held that the " Legislature has the power to bind the State in relinquishing its " power to tax a corporation. It has been held that such a provi- " sion in the charter of an incorporation constitutes a contract " which the State may not subsequently impair. These doctrines " have been reiterated and reaffirmed so recently as the year 1871, " in an opinion delivered by Mr. Justice Davis in the case of *The* " *Wilmington Railroad v. Read*. They must be considered as " settled in this Court. " *Wilmington R. Co. v. Read*, 13 Wall., 264; *State Bank v. Knoop*, 16 How., 369, 380, 382, 387, 390; *Pac. R. Co. v. Maguire*, 20 Wall., 36.

Authorities might be multiplied to the effect that such a law is a legitimate act of legislation; that it is not only a law but a contract whose inviolability is guaranteed by the Constitution of the United States.

But it is argued that although the Territory of Minnesota had the power as against itself and the State of Minnesota to exempt these lands from taxation, it had not the power as against the United States or the Territory of Dakota. That as soon as the Territory of Dakota was formed it had the right and power to tax

these lands—the prior contract of the Territory of Minnesota to the contrary notwithstanding.

As to the United States we have seen that it conferred on the Territory of Minnesota the power to enact such a law subject only to the veto of Congress and that Congress by not disapproving, impliedly sanctioned this very act. There is no basis, therefore, for the suggestion that the Territory of Minnesota, in this respect, attempted or did any thing which was unauthorized or disapproved by or hostile to the United States.

It is not to be lightly supposed that, after a contract like this has been by the permission and authority of the United States entered into, and after it has been fulfilled to the letter on the part of the Transit Railroad Company and its successors and assigns, the United States would deliberately repudiate it or impair its obligation. And it gives me pleasure to add that there is not a word or indication in any act or law of the U. S. which has been called to our attention to justify an intimation or suspicion that it has been guilty of such bad faith.

As to the Territory of Dakota, the contention is that the clause of the constitution of the U. S. which forbids *a State* to pass any law impairing the obligation of contracts—is not applicable to a *Territory*. But this being conceded the defendant's position is not strengthened thereby ; for by its organic Act, the Territory of Dakota is expressly inhibited from passing *"any law impairing the rights of private property."* Rev. Statutes U. S. Sec. 1925. This, as to the Territory, is the equivalent of what the contract clause of the Constitution of the U. S. above referred to, is to the States. That contract rights are property will not be denied.

Nor is it true, that, because the Territory of Minnesota was divided, that the contracts right of the plaintiff, in that part of it which has become incorporated into Dakota, are affected or

forfeited. The new sovereign in such cases succeeds subject to all property rights before vested. If this were not true, then if the State of Minnesota should be again divided, or if any State should be divided, the rights of private parties might be thus destroyed. The palpable injustice of such a proposition shocks the moral sense. But it can hardly be necessary to further discuss these phases of the case. Property rights are not in this country held by so uncertain a tenure. As we have above seen the Constitution of the U. S. and the organic Act of the Territory of Dakota, expressly forbid and make impossible such confiscation.

But it does not seem to me that the Territory of Dakota has attempted or intended to violate or divest any vested rights. The law by which it is claimed these taxes are authorized is the general revenue law of the Territory, in the enactment of which such cases as this were not considered any more than were government bonds or other exempt property held by private parties.

It is not claimed by the plaintiff's attorney and certainly it can not be allowed that the laws of the Territory or State of Minnesota can have any extra territorial effect or operation. When the law of 1857 which exempted these lands from taxation was enacted, the portion of the Territory of Dakota in which these lands lie was represented in that legislature. It was then a part of the Territory of Minnesota.

That it was intended by that act on the conditions and for the consideration therein expressed to exempt these very lands is clear. The language of the Act will admit of no other construction. It is as follows: "Sec. 2. For the purpose of aiding in the " construction of the railroad, which . by this act the Transit Rail- " road Company is authorized to construct, *all the interest and* " *estate present and prospective* of this Territory and future " State in and to *any and all* of the lands granted by the govern-

" ment of the U. S. to the Territory of Minnesota for the purpose'
" of aiding in the construction of a railroad * * * *together*
" with all and singular the rights, privileges and immunities
" conferred or intended to be conferred upon said road by said
" Act of Congress, are hereby granted to and vested in said Transit
" Railroad Company. * * * Sec. 4. The said lands so granted
" shall be and are exempted from all taxation." etc.

And as said by the Supreme Court of the U. S. in a like case:
" If the contract is plain and unambiguous and the meaning of
" the parties to it can be clearly ascertained, it is the duty of the
" Court to give effect to it the same as if it were a contract between
" private persons without regard to its supposed injurious effects
" upon the public interests." *Pacific R. Co., v. Maguire* 20
Wall., 43.

And it may be added that the consideration paid by the Railroad
Co., for this immunity was ample, and as it is conceded by the
pleadings, has been fully paid and performed according to agree-
ment. A railroad was thus secured, at a great expense, in advance
of settlement, into this country. And there is not one word of
evidence in the case, or a fact found or admitted to indicate that
the conduct of the railroad company, in this affair has not been
characterized by good faith.

The grant of these lands by the U. S. to the Territory of Minne-
sota was *in presenti*—it operated to vest an immediate title in
the Territory; *Schulenberg v. Harriman*, 21 Wall., 60, 62;
*Lawrence & L. R. Co. v. U. S.*, 92, U. S., 741, 742, 748, 749;
*Grinnell v. Railroad Co.*, 103 U. S., 739, 742; 9 Opinion of
Attorneys General, 254-5; *Newhall v. Sanger*, 92 U. S., 761-2-3;
*Cent. Pac. R. Co. v. Dyer*, 1 Sawyer, 642, 651-2; *Mo. K. & T.
R. Co. v. Kan. Pac. R. Co.*, 97 U. S., 491.

And the Territory had the right to appropriate them for the
purposes expressed in the Act of Congress. It did not attempt to

dispose of them or grant them for any other purpose. On the contrary, the proviso in Section 2, of the Act of the Territorial Legislature of May 22, 1857, granting the lands to the Transit Railroad Company is in these words: " Provided that the said " lands shall be exclusively applied to and used by the said Transit " Railroad Company in the construction of said railroad from " Winona via St. Peter to a point on the Big Sioux river south of " the 45th parallel of north latitude, and shall be disposed of only " in the manner prescribed in said Act of Congress, approved " March 3, 1857, and shall be applied to no other purpose what- " soever. "

It may be admitted that it was not competent for the State to grant those lands to the Transit Railroad Co., absolutely and without reference to the performance of those acts which were made by the Act of Congress a condition precedent to such right of disposition.

As we have seen, no such thing was attempted. If the Act of the Territorial Legislature did not operate as an unconditional grant, it was at least a valid contract with the Railroad Company that it might earn the lands. As such it was in strict accordance with the Act of Congress and in pursuance of its provisions and in furtherance of its policy.

This is the very course which has been generally—I believe uniformly—pursued in all such cases, not only in Minnesota, but in the several western states, to which such grants have been made, as the statute laws and the reports of their courts show.

The legality and propriety of such a practice is recognized by the decisions of every western state, as it is also in the last case cited from Supreme Court U. S. (*Grinnell v. Railroad Co.*, 103 U. S., 742.) The cases cited by the defendant's counsel, and which, it is claimed, held a contrary doctrine, are not in point. They merely hold that the State or Territory to which the grant is

made cannot transfer the lands except subject to the conditions and limitations imposed by Congress; which is admitted.

In the cases cited by defendant's counsel, the attempt was made to dispose of the lands without the building of a single mile of road.   In other words, it was attempted to dispose of the lands in violation of both the letter and spirit of the law.   It was held that this could not be done : *Schulenberg v. Harriman,* 21 Wall., 59; *Railroad Co. v. Carroll County,* 41 Iowa, 153, 162, 163. But it certainly does not follow that it is not competent for the legislature to make a binding contract with any person or company *to comply with and fulfill the objects and purposes of the land grant acts.*   It is not expected in such cases, nor would it be desirable, that the State or Territories to which such grants are made should themselves build the roads, and as the lands can be used only to aid in building the road, it must be competent for such State or Territory to contract with some corporation or person to do the work.   And of course if it has the power to do this it has the power to make a binding contract that, on the performance of the conditions specified, the Railroad Company shall become entitled to the bounty of Congress; and such other conditions as may be agreed upon.

This being so, these lands were clearly exempt from taxation while they were owned by the Transit Railroad Company.   We are led, therefore, to the consideration of the second question in the case, namely:   Did this plaintiff succeed to the immunity from taxation possessed by the Transit Company?

This is denied by the defendant's counsel.   But after a most careful consideration of his very able argument, I am not able to assent to his conclusions.

It cannot be questioned but that it is within the power of a State or Territory (in the absence of any limitation of its power) by which a railroad corporation is created, to authorize and

empower such corporation to mortgage its property, franchises and immunities of every nature and kind. This is elementary law and the authorities above cited clearly declare it. Indeed, we believe it is not denied by the defendant's counsel that the Transit Railroad Company had such power.

Hence we have this state of facts: The trust deed or mortgage made by a party (which owned the property) conveyed in trust *"all " the rights, property, privileges, franchises and immunities of the " Transit Railroad of every nature and kind whatever which were " then owned by the said Company, or which should thereafter be " acquired or owned by it,"* * * and authorized the trustees therein named in case the Transit Railroad Company should fail to pay the principal or interest of said State bonds or of said first mortgage bonds, * * *"to enter upon and take possession of all "and singular the rights and interests, property, privileges, fran-"chises and immunities granted in trust as aforesaid, and to sell "and dispose of the same,"* etc.

The default which justified the foreclosure, and the legality of the foreclosure are not questioned. And it is admitted that the Governor who acted instead of the trustees named in the mortgage or deed of trust (as he was by law authorized to do) did in fact, bid in and transfer to the State *"all the property, rights, privileges, franchises and immunities pledged in said deed of trust;"* and that the State subsequently conveyed to this plaintiff *" all the property interests, corporate rights, privileges, and fran- " chises of or which before had belonged to or were owned by the " Transit Railroad Company."*

And all this was done while a law was in force which expressly provided that the purchaser at such sale should succeed to and " acquire thereby and shall exercise and enjoy thereafter *all the " same rights, privileges, grants, franchises, immunities and ad- " vantages* in and by said mortgage and trust deed enumerated

" and conveyed, which belonged to and were enjoyed by the com-
" pany making such deed or mortgage,     *     *     as fully and
" *absolutely in all respects as the corporators, shareholders, officers*
" *and agents of such company might, or could have done thereto-*
" *fore had no such sale or foreclosure taken place.*"   .

Here is a clear and apparently perfect chain of title from the owner to this plaintiff.    It was not on the argument questioned, but that a grantee or purchaser, at a mortgage or execution sale of " all the property, privileges franchises and immunities," or of "all the property, franchises and privileges " of such a corporation obtains and succeeds to  the privilege or immunity of exemption from taxation which  the grantor, mortgagor or execution debtor may have possessed.

And, if this was not admitted, the proposition is no longer open to question or doubt.    See, *Q. & N. R. Co. v. Gaines*, 3 Fed. Rep., 266; *Humphreys v. Pegues*, 16 Wall., 244; *St. Paul & Pac. R. Co., v. Parcher*, 14 Minn., 297; *State v. W. & St. P. R. Co.*, 21 Minn., 315; *State v. Trustees*, 21 Minn., 344.

Though in each of the following cases  the exemption from taxation was denied, it is conceded that, if the language which is used in this case had been used in those the purchaser, at mort-gage or execution sale, would have taken and acquired the privilege or immunity of exemption from taxation. *Morgan v. Louisiana*, 93 U. S., 217, 224; *Railroad Co. v. Gaines*, 97 U. S., 697, 711, 712; *Railroad Co., v. Hamblen*, 102 U. S., 273; *Railroad Co , v. Commissioners*, 103 U. S., 1; *Wilson v. Gaines*, 103 U. S., 417.

But defendant's counsel  claims—and I believe this is the point principally relied on —that though the Transit Co., may have mortgaged all its property, franchises, privileges and immunities including the privilege of exemption from taxation, and though that mortgage may have been legally foreclosed and all the rights,

property, privileges, franchises and immunities bid in by the Governor and by him transferred to the State, yet that the immunity from taxation became extinguished or merged when transferred to the state. Of course it is familiar law that when the lesser estate and the greater, or the equitable and legal estate meet in the same party, the general rule is that the equitable estate merges in the legal, or the lesser in the greater. But the question of merger is one purely of intention, declared or presumed ; and it is competent for the person in whom such estates meet to prevent such merger, and hold, without merger or extinguishment, the lesser or equitable estate. *Davis v. Pierce*, 10 Minn., 378 ; *Horton v. Moffitt*, 14 Minn., 293 ; *Railroad Co., v. Parcher*, 14 Minn., 303, 304.

This rule is well illustrated by the case of a person who acquires by assignment, or otherwise, a mortgage on real property, while he owns the fee.

Ordinarily, in such case, the *mortgage interest* would become merged in the fee, and *extinguished*. But to this rule the exceptions are numerous and well understood by every lawyer. In such case, the mortgage interest may be, at the option of the owner of the mortgage, held without merger or extinguishment. And, when it is for his interest to hold it separate, the presumption, in the absence of evidence to the contrary will be that he so intended. See authorities last above cited. It may be argued that it is absurd to hold that a man has a valid mortgage of his own land.

This is technically true. But the law does not favor hair splitting quibbles ; but rather seeks to subserve the ends of justice and to effectuate the intention of the parties. This is especially true, when a state is a party or the act of a legislature is to be interpreted, in which case all merely technical rules must yield to the legislative will. It must be borne in mind in such cases that the legislative acts are *laws* as well as *contracts*, and that the

intent must not be defeated by applying the technical rules of the common law. *Mo. R. Co., v. Kan. Pac. R. Co.,* 97 U. S., 497 ; *Schulenberg v. Harriman,* 21 Wal., 62.

As said by the Supreme Court of the U. S., in the case above cited (97 U. S., 497). " *The rules of the common law must yield in this as in all other cases, to the legislative will.*"

It is admitted by the pleadings in this case and found as a fact, that the state of Minnesota intended to hold and regrant, without merger or extinguishment all the lands, property, franchises, privileges and immunities which the Transit Railroad Company owned or possessed, and, in my judgment, according to the rule laid down by the Supreme Court above, this intention must prevail in this case. See *Railroad Co. v. Parcher,* 14 Minn., 303, 304, 329, 330; *which is an adjudication on this very question.* See also, *State v. W. & St. P. R. Co.,* 21 Minn., 315.

Nor have I been impressed by the force of the argument of defendant's counsel that because the state of Minnesota is the creator and grantor of the franchises, immunities and privileges which it acquired and assumed to regrant as aforesaid, it can not hold them without merger as a natural person might.

The answer to this seems plain. Not only, as before said the will of the legislature in such cases, as in all cases must prevail ; but, when a state descends from the plane of its sovereignty and contracts with private persons, it is regarded *pro hac vice* as a private person itself, and is as to that transaction to be so treated and considered. *Davis v. Gray,* 16 Wal., 232 ; *Curran v. Arkansas,* 15 How., 308, 309 ; *St. Paul & Pac. R. Co., v. Parcher,* 14 Minn., 303, 304, 329 330 ; *U. S. Bank v. Planter's Bank,* 9 Wheat., 906, 907.

Besides, as to the franchises, immunities, etc., pertaining to that part of the lands in this Territory, the doctrine of merger which was argued and decided in the cases in Minnesota, is

Winona & St. P. R. R. Co., v. The County of Deuel et. al.

wholly inapplicable. When the Governor of Minnesota pur-
chased these lands, the territory of Dakota had ceased to be a
part of Minnesota. Within the territory of Dakota, Minnesota
had no rights or power, more than any other artificial person.

It could purchase and hold property there, not as sovereign,
but as a private person, subject to all the duties, liabilities and
taxes imposed on private persons. *In the absence of any law or
expression of intention to the contrary*, it might be said as to
*lands within the state of Minnesota*, as said by the Supreme
Court U. S. in a case hereafter cited. " When the state became
" the purchaser, the immunity ceased ; the property stood in its
" hands precisely the same as any other unincumbered property
" of the state, exempt from taxation, not by virtue of any
" previous stipulation with the company, but as all property in
" the state is thus exempt." *Trask v. Maguire*, 18 Wal., 404.

But, when the state of Minnesota purchased or acquired lands
*in the territory of Dakota*, it took and held them as a private
party and subject to taxation as the lands of any private party.
If these lands are or have been exempt, at any time, from taxa-
tion in Dakota, it is because of the immunity granted and
guaranteed by the Act of the territory of Minnesota, of 1857,
above referred to—not because the sovereign state of Minnesota
held them. The state beyond its own limits is not clothed with
any of the attributes of sovereignty.

It must not be lost sight of in this case that when the law of
the territory of Minnesota was enacted which exempted these
lands from taxation they were *within the limits of Minnesota*.
Hence as to that part of the now territory of Dakota, the terri-
tory of Minnesota had all the jurisdiction which any sovereign
has over its own territory.

Hence the case of *Trask v. Maguire*, 18 Wal., 391, is not an
authority against the plaintiff in this case, but it seems to be an
authority in favor of the plaintiff.

That was a case in which a loan of State credit was made by the state to a Railroad Co., whose property was exempt from taxation. The company having made default, the state sold its property, franchises, etc., and bid them in, and afterwards regranted them to another company. Mr. Justice Field, in delivering the opinion of the court in that case, uses this language: " The act under which the sale was made, provided that the pur- " chaser of the road should have all the rights, franchises, privi- " leges and immunities which were enjoyed by the defaulting " company and not inconsistent with the act authorizing the sale. " The new company thus acquired all the immunity from taxa- " tion which the original company had possessed, if it were " competent for the legislature, at the time under the new Consti- " tution to confer this privilege. The question, therefore, is " whether the legislature was competent to grant the immunity " claimed."

The court there holds that the immunity from taxation granted to the original Co., having been merged and having ceased to exist, it was not competent to renew it under the Constitution of that state. It was not intimated by the court that it would not have been in the power of the state to prevent such merger by a law to the contrary, or by any expression of an intention to the contrary. And in the absence of such intention, express, or implied, it is well settled that there would, under the circumstances existing in that case, be a merger and extinguishment of the original privileges or franchises granted.

The question, as held by the Supreme Court of the United states in the case last cited, is whether the Constitution and laws of the State authorized it to continue these franchises, etc., without merger or extinguishment.

As we have seen, the highest courts of Minnesota have uniformly and repeatedly decided that the constitution and laws of that state gave this power, and that, therefore, the

plaintiff succeeded to all the property, rights, powers, privileges, franchises and immunities of the Transit Company. As we have before said, we believe this is sound doctrine and defensible on principle, and by the authorities. But I also believe that the decisions of the Supreme Court of Minnesota, construing its own constitution and laws, are conclusive of the question. To hold that other courts will not follow the decisions of the courts of a state in construing its own constitution and laws, would lead to the most absurd and alarming consequences; *vide* cases cited next below. At the very same time it might be decided that a consti- or law, did, and did not authorize a given act, or confer given rights.

A party could never be certain as to his rights under any law until the question had been passed upon by *all* the courts, before which it could be raised. The law certainly does not countenance such absurdities. On the contrary, it is well settled that the construction which the courts of any state may give to the Constitution or statute law of such state, is conclusive on, or, at least, will be followed by the U. S. Courts, and the courts of other states and territories.

Such Construction becomes thereafter a part of the law or Constitution ; *Jessup v. Carnegie*, 80 N. Y., 441, and cases there cited.

This case, and the cases cited in the opinion, clearly and accurately lay down the rule with its exceptions. See also the following : *Hunt v. Hunt*, 72 N. Y., 236, 237, and cases cited. *Walker v. State Commissioners*, 17 Wal., 648, 650, 651 ; *Secombe v. Rail Road Co.*, 23 Wal., 108 ; *Town of Ottawa v. Perkins*, 94 U. S., 266, 267, 268 ; *Peck v. Chicago Rail Road Co.*, 94 U. S., 178 ; *County of Leavenworth v. Barney*, 94 U. S., 71 ; *Adams v. Nashville*, 92 U. S., 21 ; *Township of Elmswood v. Marcy*, 92 U. S., 289, 294.

*The Bark Prince Alexander*, 8 Benedict 209 ; *Fifield v. Co. Gallatin* 100 U. S., 47, 41, 52, 54 ; *State Railroad Tax cases*, 92 U. S., 576, 617,, 618.

None of the exceptions to · or limitations of this general rule, touch this case. The rule, of course, does not apply in a case on appeal to the Supreme Court of the U. S. from a state court. In such a case it must follow that the appellate court would not be bound by the decision of the court from which the appeal is taken. Or, if contracts, when made, are valid by the laws of the state as then expounded, their validity can not be impaired by subsequent legislation, or the decisions of the courts altering the construction of the law. In other words, as against contracts which are valid when made, a change of decision of state courts will not be allowed by the federal courts to have a retroactive effect. But no exception to the general rule, which would affect this case, has been brought to the attention of the court, and it is not believed that any such could be referred to.

The case of *Secomb v. R. Co.*, 23 Wal., 108, above cited is in point not only on principle, but on the peculiar facts of this case. In that case ejectment was brought by Secombe against the defendant for a lot in Minneapolis, which had been acquired by condemnation of the Minnesota Central R. Co., which was the successor in interest of the Cedar Valley R. Co.

The Cedar Valley R. Co., was one of the Land Grant Railway Companies of Minnesota and its property, franchises, etc., were sold and bid in by the Governor and transferred to · the State, which transferred them to the Minnesota Central R. Co., which transferred them to the defendant in that action.

The steps taken to foreclose the trust deed and sell and transfer the property and franchises in that case, were identical with the steps taken in this—and under the same Statute and Constitution.

Secombe claimed in that case, as defendants in this, that, when

the property, franchises, privileges, etc., were bid in by the Governor, they became merged and extinguished; and that, under the Constitution of the state of Minnesota, which then denied to the legislature the right to grant such franchises, or to create a corporation, it was incompetent for the legislature to confer on the incorporators of the Minn. Central R. Co., the corporate franchises or the right to be a corporation. This was true, of course, if the franchises of the first Company became merged and extinguished, when acquired by the State. But the Supreme Court of the U. S. in the case cited page 117, held that it would of course, and without examination follow the decision of the State Court, and it did follow it and decided against the merger and in favor of the right of the state to hold and regrant without merger or extinguishment the franchises, etc., of the first Company. In this it not only followed but cited and relied on *Parcher v. R. Co., supra.*

While I assent to the doctrine laid down by the Supreme Court of Minnesota, in the cases cited, I think that, even if their soundness were doubtful, the cases above cited clearly show them to be conclusive as to the proper construction of the Constitution and Statute laws of that State.

To a proper understanding and decision of this case, certain considerations must not be lost sight of. The forfeiture so called is not a forfeiture of any of the rights, privileges, franchises or immunities granted by the Act of the Territory of Minnesota of 1857, which granted to the Transit Railroad the lands, franchises and privileges aforesaid.

Under and by that Act on the conditions and for the consideration expressed, certain property, franchises and privileges were granted to the Transit Co., among which was the immunity from taxation. The Transit Railroad Company accepted that Act, and it and its successors have strictly complied therewith.

But there are two contracts referred to in the case to which

the Transit R. Co., was a party. The first was entered into the spring of 1857, by and between the Territory of Minnesota and the Transit Company. The second in the spring of 1859, by and between the State of Minnesota and the Transit Co.

It was under the *former* that the lands were exempted from taxation. That contract has been complied with by the Transit Co., and its successors, and therefore, I believe they are legally and equitably entitled to the consideration stipulated and agreed upon for such performance.

The latter contract was not complied with by the Transit Co. It was under it that the foreclosure referred to was had. But it is wholly immaterial so far as the rights of the parties to the first contract are concerned, or so far as the rights of the Territory of Dakota (which has succeeded as to these lands, to the rights and duties of the Territory of Minnesota) are concerned—whether the latter contract was complied with by either party thereto or not. As to that contract, the state of Minnesota had the legal and equitable right to waive any performance, or to waive a forfeiture on part of the Transit Co., in whole or in part ; or to enforce the contract as against that Company in any manner which to the State might seem best. The judgment of the Court below is, therefore,

AFFIRMED.

Mr. Justice MOODY dissenting: